**NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY**

v.

**PUBLIC UTILITIES COMMISSION.**

Supreme Judicial Court of Maine.

June 28, 1978.

Pierce, Atwood, Scribner, Allen, Smith & Lancaster by Jotham D. Pierce, Jr., (orally), Ralph I. Lancaster, Jr., Everett P. Ingalls, George J. Marcus, Portland, C. Duane Aldrich (orally), Robert D. Bruce, Christopher M. Bennett, Boston, Mass., for plaintiff.

Horace S. Libby (orally), Thomas R. Gibbon, Alan G. Stone, Frederick S. Samp, Public Utilities Commission, Augusta, for defendant.

Before POMEROY, WERNICK, ARCHIBALD, GODFREY and NICHOLS, JJ., and DUFRESNE, A. R. J.

POMEROY, Justice.

On October 8, 1974, New England Telephone and Telegraph Company (New England) filed with the Maine Public Utilities Commission (Commission) a revision of New England's then effective schedule of intrastate rates, tolls, and charges designed to achieve an increase in gross annual revenues of approximately $21,000,000 or about 25% above its 1974 intrastate revenues. On July 3, 1975, the Commission granted a "temporary" rate increase of $9,500,000; and, on February 13, 1976, it granted a "permanent" rate increase of $9,074,000, from which New England appealed. On August 10, 1976, this Court sustained New England's appeal and held the schedule of rates put into effect by the $9,500,000 rate increase, being the last lawful rates, to be the effective rates. In addition, this Court remanded to the Commission to undertake an investigation of the justness and reasonableness of the $9,500,000 rate increase as permanent rates.

On September 10, 1976, New England filed with the Commission a new revised schedule of rates designed to achieve an increase in gross annual intrastate revenues of approximately $27,000,000, or about 24% above the revenues which would otherwise be generated during the year beginning July 1, 1977. The Commission consolidated the September 10, 1976 application and the case remanded to it by this Court's August 10, 1976 decision into one rate investigation proceeding.

On June 10, 1977, the Commission issued its final Decree in this matter, ordering New England to *reduce* its rates so as to produce a decrease in annual revenues of $1,900,000. A number of appeals, complaints, and motions to this Court followed. On September 2, 1977, then Chief Justice Armand A. Dufresne, Jr., stayed the effect of the Commission's June 10, 1977 Decree, leaving in effect New England's authorized rates which were in existence before the Decree. Those prior rates would remain in effect until this Court's final determination of the issues raised with respect to the June 10, 1977 Decree. However, if the case remained undecided on July 1, 1978, New England would be allowed a temporary rate increase to produce additional revenues of $5,000,000, pending final determination by this Court. Oral arguments were held on February 10, 1978.

We decided that the case must be remanded to the Commission to determine the appropriate revenues to be allowed New England based upon our disposition of the issues in the case which, in summary, is as follows.

A—The Court overrules the Commission on the following issues:

1. *Accelerated Depreciation.* The Commission disallowed as a legitimate expense for ratemaking purposes federal income taxes deferred by New England's use of accelerated depreciation instead of straight-line depreciation. The Court decides that this adjustment is contrary to the estab-

lished national economic policy established by Congress, and that the Commission's arbitrary treatment of New England's books of account in this respect and its placing of New England in jeopardy of losing its right to take such accelerated depreciation constituted an abuse of discretion.

2. *Double Leveraging Adjustment.* The Commission reduced New England's allowed rate of return to account for the double leveraging in AT&T's 86% ownership of New England. The Court decides that the Commission failed to give adequate consideration to the effect of its double leveraging adjustment upon the 14% of New England's stock owned by 45,000 members of the investing public.

3. *Commission Audit.* The Commission ordered that New England bear the cost of an audit of its books of account by an outside firm under the direction of the Commission. The Court concludes that the Commission lacked the statutory authority to require New England to bear the cost of such an investigation.

B—The Court sustains the Commission on the following issues:

1. *Allocation of AT&T Interest.* The Commission allocated to New England a portion of the interest paid by the consolidated Bell System on debt owed by the parent company, American Telephone and Telegraph Company (AT&T). The allocation of this interest to New England reduces, for ratemaking purposes, the income taxes it owes, thereby reducing the revenues necessary to pay such taxes.

2. *Cost of Debt.* The Commission determined New England's cost of debt to be 6.99%. New England's proposed 10-year amortization period for a debenture repurchase premium was rejected for a 33-year period, which resulted in a lower cost of debt.

3. *Cost of Equity.* The Commission determined New England's cost of equity to be 11.5%.

4. *Attrition Allowance.* The Commission made an allowance for attrition of .56% of rate base instead of New England's proposed allowance of .76%. The Court finds this figure to be reasonable in result and methodology and supported by the evidence. However, recalculation will be required in light of the disposition of other issues.

5. *Working Capital Allowance.* The Commission reduced New England's proposed working capital allowance based upon its treatment of service contract fees paid by New England to AT&T.

6. *Pre-1971 Investment Tax Credits.* The Commission deducted New England's accumulated pre-1971 investment tax credits from its rate base, thereby reducing the property on which its stockholders are entitled to a return.

7. *Charitable Contributions and Legislative Expenses.* The Commission disallowed as an expense chargeable to ratepayers New England's charitable contributions and lobbying expenditures.

8. *Other Issues.* The following Commission orders are upheld:

a. that New England keep a record of all contacts with the I.R.S. concerning the accelerated depreciation issue;

b. that New England publish certain of its rates and tolls in its telephone directories;

c. that New England inform customers who are applying for new service about the service charges and party-line options;

d. that New England advise the Commission of any problems inherent in offering one-party, two-party and four-party residential service;

e. that New England show on its monthly bills the number of directory assistance calls made by each customer;

f. that New England provide free directories covering all exchanges within 30 miles of the customer's exchange and charge no more than $1.00 for any other Maine directory;

g. that New England show on its monthly bills the number of hours of WATS usage to all WATS customers.

C—The Court does not decide the following issues:

1. *Other Tax Deferral Issues.* New England conceded that a recent decision of this Court decided certain tax deferral issues in the Commission's favor.

2. *Gross Receipts Tax.* The parties have agreed that the gross receipts tax adjustment is no longer in issue.

3. *Rate Design.* The Court concludes that it is unnecessary to consider issues arising from rate design at this time because a new rate design will be proposed on remand to the Commission to account for the effect of our decision on revenues to be allowed New England.

## INTRODUCTION

■ The United States Supreme Court said in *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), nearly half a century ago,

The rate-making process under the Act, i.e., the fixing of "just and reasonable" rates, involves a balancing of the investor and the consumer interests. Thus we stated in the *Natural Gas Pipeline Co.* case that "regulation does not insure that the business shall produce net revenues." 315 U.S. p. 590, 62 S.Ct. 736, 86 L.Ed. 1037. But such considerations aside, the investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated. From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include services on the debt and dividends on the stock. (citation omitted). By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital. *Id.* at 603, 64 S.Ct. at 288.

Ratemaking in theory is a relatively simple process. To the cost of producing the service furnished is added a reasonable return to the investor. The making of public utility rates requires four basic determinations:

1. what are the enterprise's gross utility revenues under the rate structure examined;

2. what are its operating expenses, including maintenance, depreciation and all taxes, appropriately incurred to produce those gross revenues;

3. what utility property provides the service for which rates are charged and thus represents the base (rate base) on which a return should be earned; and

4. what percentage figure (rate of return) should be applied to the rate base in order to establish the return (wages of capital) to which investors in the utility enterprise are reasonably entitled. *Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission,* 262 U.S. 276, 291, 43 S.Ct. 544, 67 L.Ed. 981 (1923) (Brandeis, J., dissenting).

Simple as this formula sounds, the task of the ratemaker is more often than not extremely difficult. This is so because the federal income tax laws have become complex and because the corporate structure of most utilities is far from simple.

The case now before us is a good example. The result which is reached by the regulator as a "just and reasonable rate" depends substantially upon which of the many alternatives for computing depreciation authorized by the Federal Internal Revenue Act is used. In addition to the complexities arising from the federal tax laws, 86% of the common stock of the petitioner is held by the parent corporation, American Telephone and Telegraph Company. Only 14% of the common stock is held by "public investors". The ratio of debt to equity in the parent corporation is quite different from the ratio in the petitioner corporation. To put it in another way, the capital structure of American Telephone & Telegraph Company is entirely different from the capital structure of New England

Telephone Company, the petitioner. Little wonder is it then that rate-making for a utility so constituted involves an always difficult and frequently confusing process, little understood by most persons unschooled in the economics of modern business practices.

The petitioner company sought approval of a rate increase calculated to produce approximately $27,000,000 in additional revenue. After hearing, the Public Utility Commission denied the rate increase and further ordered a decrease in its rates so as to produce $1.9 million less than the income produced as a result of the previously approved rate.

Not surprisingly the utility has appealed.

This was accomplished by filing Notice of Appeal pursuant to the provisions of 35 M.R.S.A. § 303 and by the institution of an action in this Court pursuant to the provisions of 35 M.R.S.A. § 305.

We reverse the decision of the Commission, finding errors of law in certain material respects. We sustain the Commission in several other respects which will be hereinafter discussed.

■ As this Court took occasion to say in *New England Telephone and Telegraph Co. v. Public Utilities Commission,* 148 Me. 374, 94 A.2d 801 (1953).

The Commission is the judge of the facts in rate cases such as this.[1] This court under the statute which created it is only a court to decide questions of law. It must be so, for it has not at its disposal the engineering and the technical skill to decide questions of fact which were wisely left within the province of the Commission. Only when the Commission abuses the discretion entrusted to it, or fails to follow the mandate of the legislature, or to be bound by the prohibitions of the constitution, can this court intervene. Then the question becomes one of law. We cannot review the Commission's findings of fact and seek to determine what rates are reasonable and just. When the Commission decides a case before it without evidence, or on inadmissible evidence, or improperly interprets the evidence before it, then the question becomes one of law. *Id.* at 377, 94 A.2d at 803.

Since the errors which we decide were made by the Commission were errors of law, i.e., misapplication of the law applicable to the facts found, a discussion of the differences in the standard of review under the provisions of 35 M.R.S.A. § 303 and 35 M.R.S.A. § 305 becomes unnecessary. *Cf. Central Maine Power Company v. Public Utilities Commission,* 156 Me. 295, 163 A.2d 762 (1960). We are greatly aided in our task of reviewing the Commission's judgment by excellent briefs filed by the attorneys for the Public Utility Commission and the attorneys for New England Telephone Company.

The order of the Commission lends itself to a division into many separate parts of the whole. We, therefore, discuss each point of appeal raised by the utility separately.

## I.

## FEDERAL INCOME TAX "DEFERRED" THROUGH ACCELERATED DEPRECIATION PROVISIONS OF I.R.C. § 167(*l*)(2)

As we previously indicated, one of the principal issues before us in this case con-

---

1. Under 35 M.R.S.A. § 305, it was written at the time of appeal:

 If in such complaint it is alleged that confiscation of property or other violation of constitutional right results from such ruling or order, the law court shall exercise its own independent judgment as to both law and facts.

 In *Mechanic Falls Water Co. v. Public Utilities Commission,* Me., 381 A.2d 1080, 1091 (1977), we said

 We therefore have not interpreted § 305 as permitting a factual determination de novo by the Law Court. *Central Maine Power Co. v. Public Utilities Commission,* 156 Me. 295, 163 A.2d 762 (1960). Factual conclusions of the Commission are independently reviewed by us with a strong presumption that they are correct and with the burden upon the utilities to clearly establish confiscation. *Id.* at 305, 163 A.2d at 768–69.

cerns the Internal Revenue Code's provisions for the taking of depreciation over the useful life of a public utility's property. The "straight line" method of depreciation allows the taxpayer to deduct from its taxable income equal annual amounts over the useful life of the asset. On the other hand, "accelerated" methods of depreciation allow the taxpayer to deduct a greater depreciation amount during the earlier years and a lesser amount during the later years of the useful life of the property. We dealt with the problem of how accelerated depreciation may be handled for ratemaking purposes in *Central Maine Power Co. v. Public Utilities Commission,* 153 Me. 228, 136 A.2d 726 (1957); and, more recently, in *Central Maine Power Co. v. Public Utilities Commission,* Me., 382 A.2d 302 (1978), and *Mechanic Falls Water Co. v. Public Utilities Commission,* Me., 381 A.2d 1080 (1977). The 1957 *Central Maine Power Co.* case was decided in the context of federal tax law existing before the Tax Reform Act of 1969, which substantially affected the availability of accelerated depreciation to public utilities. *Mechanic Falls Water Co.* discussed federal accelerated depreciation under the Tax Reform Act of 1969 for pre-1970 utility property. The 1978 *Central Maine Power Co.* case considered state accelerated depreciation for post-1969 property. In this case we are dealing with the different issue of federal accelerated depreciation for post-1969 utility property under § 167(*l*)(2) of the Internal Revenue Code.

Implicit in the Commission's decision in the case now before us is (1) that accelerated depreciation results in a true tax "saving" and (2) that under the Internal Revenue Code a taxpayer may compute his tax on the basis of accelerated depreciation and at the same time use straight-line depreciation for rate-making purposes.

In 1969, the entire Internal Revenue Code was overhauled by the Congress with a view to affecting "reforms". Extensive and revealing hearings were held by the Ways and Means Committee of the House of Representatives of the Congress. As a result of the hearings, the Internal Revenue Code was amended to include the present provision of Section 167(*l*). The House report contains the following statements of conclusion:

Present law.—Under present law, regulated industries are permitted the same elections regarding depreciation of their business properties as are other taxpayers. About half the regulatory agencies require utilities that use accelerated depreciation for tax purposes to "flow through" the resulting reduction in Federal income taxes currently to the utilities' customers. Other agencies permit the utilities they regulate to "normalize" (as described below) the deferred tax liabilities resulting from accelerated depreciation. Some agencies insist that utilities subject to their jurisdiction use accelerated depreciation for tax purposes; even if those utilities use straight line depreciation for tax purposes, such agencies treat them for ratemaking purposes as though they had reduced their Federal income tax expense by using accelerated depreciation.

General reasons for change.—The trend of recent years has been that regulated utilities previously on straight line depreciation have been shifting to various forms of accelerated depreciation. At the same time, regulatory agencies which had previously permitted the tax deferrals resulting from accelerated depreciation to be "normalized" (computing the greater Federal income tax liability that would have resulted from use of straight line depreciation and adding this amount to a reserve account for future tax liability on the regulated utility's books of account), have been shifting toward requiring the flowing through to customers currently of the tax deferrals resulting from the use of accelerated depreciation. Finally, within the past 12 months several agencies have imputed accelerated depreciation in determining the Federal tax expense of the utilities, and flowed through the resultant tax deferrals, even though the particular utilities involved were in fact using straight line depreciation and in fact were paying the greater

current Federal income taxes resulting from the use of that method of depreciation.

In general, flowing through the tax deferral to the customers of a utility that is already earning its maximum permissible profit on its investment, results in a doubling of the Government's loss of revenue, from the use of accelerated methods of depreciation for tax purposes. This is because the current tax reduction reduces the rates charged to customers, which in turn reduces the utility's taxable income and therefore reduces its income tax. This second level of tax reduction is passed on to the utility's customers, with the same effect. Assuming no other factors become involved, the total loss of taxes may be computed as the initial loss divided by the excess of 100 over the utility's marginal tax rate. At the present surcharge rates, the total tax loss is 212 percent of the initial loss; without the surcharge, the total loss is 192 percent of the initial loss.

Your committee has been advised that, if those trends were to continue, there could very shortly be a revenue loss of approximately $1.5 billion; some estimates indicate that the loss might be considerably closer to $2 billion per year. Your committee has determined that the likely revenue loss from wholesale shifts to accelerated depreciation and flow through is unacceptable at this time.

Consideration has been given to suggestions by the Federal Power Commission and others that regulated utilities no longer be permitted to use a method of depreciation other than straight line. However, your committee concluded that, in too many cases, this would place regulated utilities at an unfair competitive disadvantage, both in terms of the sale of their products or services and their attractiveness to equity investors. Also, this would result in prompt, substantial, and widespread utility rate increases.

Accordingly, your committee has determined in general to "freeze" the current situation regarding methods of depreciation in the case of those companies in

what are, by and large, the more healthy utility industries. No change is made regarding utility industries whose members are, by and large, earning well below their permitted rates of return. *H.R. Report No. 91–413,* 91st Cong., 1st Sess. (1969), *reprinted in* [1969] *U.S.Code Cong. & Admin.News,* pp. 1645, 1782–83.

Also illuminating is the explanation as to treatment to be accorded depreciation as to post-1969 property.

In the case of new property (property completed or acquired after December 31, 1969) the bill provides that if the taxpayer presently flows through to its customers the benefits of deferred taxation, then it must stay on accelerated depreciation and flow through unless the regulatory agency permits it to change. In all other cases, accelerated depreciation is to be permitted only if the utility normalizes the deferred income taxes. (The taxpayer will be permitted to elect straight line depreciation as to such new property and, if the taxpayer seeks to use accelerated depreciation, the regulatory agency will be permitted to in effect force the taxpayer to straight line depreciation by not permitting normalization. The regulatory agency will not, in such cases, be permitted to require flow through of deferred taxes.) *Id.* at 1783–84.

The Senate Report explanation of provisions contains in part this statement:

The committee amendments provide that the requirement of normalizing is not met by simply normalizing the regulated books of account of the utility if these books of account may be ignored by the regulatory agency in setting rates. Under the committee amendments, while the regulated books of account are to be used as the basic source of information, these books are not to control if the current rates of the utility are set by reference to the flow-through method. This is done because the use of flow-through in setting rates would produce the revenue loss the bill seeks to avert. *S.Rep. No. 91–552,* 91st Cong., 1st Sess. (1969), *reprinted in* [1969] *U.S.Code Cong. & Admin.News,* pp. 2027, 2206.

The stated purpose of the provision of 167(*l*) of the Code was to stop the government's loss of revenue when the utility uses accelerated depreciation and regulatory agencies require flow-through. As the Committee reports both say, this results in a doubling of the government's loss of revenue because the current tax reduction reduces the rate charged to customers, which in turn reduces the utility's taxable income and therefore reduces its income tax. The action taken by the Commission in this case in "handling" the accelerated depreciation issue clearly defeats the stated purpose the Congress had in enacting § 167(*l*) of the Code in the Tax Reform Act of 1969. Also it is clear from reading the hearings, that the Congress recognized that when accelerated depreciation was used, no tax "sav-, ings" were thereby affected, rather payment of the tax was "deferred" in part. The intended effect of this deferral was to create a deferred tax reserve which provided interest-free capital to the utility hopefully to be used for plant expansion. Flow-through of the reserve funds so created clearly has the effect of defeating the intention of the Congress.

As we earlier said, in setting rates that are "just and reasonable", as required by 35 M.R.S.A. § 51, the Public Utilities Commission must make four basic determinations: (1) what are the enterprise's *gross utility revenues* under the rate structure examined; (2) what are its *operating expenses,* including maintenance, depreciation and all taxes, appropriately incurred to produce those gross revenues; (3) what utility property provides the service for which rates are charged and thus represents the base (*rate base* ) on which a return should be earned and (4) what percentage figure (*rate of return* ) should be applied to the rate base in order to establish the *return* (wages of capital) to which investors in the utility enterprise are reasonably entitled.

1 A. Priest, *Principles of Public Utility Regulation* 45 (1969). *See also Mechanic Falls Water Company v. Public Utilities Commission, supra* at 1095. The following discussion concerns an important and substantial component of New England Telephone and Telegraph Company's (hereinafter called New England) "operating expenses", namely the calculation of its federal income tax expenses for ratemaking purposes.

As part of its tax expense for the test year (1976), New England claims $3,612,000 in "deferred taxes".[2] This amount represents the taxes "deferred" by New England by using an accelerated depreciation method as opposed to a straight-line depreciation method as provided under § 167 of the Internal Revenue Code, I.R.C. § 167.[3] New England proposed to "normalize"[4] the tax-

---

**2.** Under the current rate of taxation, a utility pays approximately one dollar in federal income taxes for every two dollars it collects from its customers. Therefore, each dollar in deferred taxes represents two dollars in revenues to the utility. Considering the effect of both the federal and state income tax systems, the allowance of $3,612,000, as a legitimate tax expense, corresponds with an increase in revenue of $8,031,164.

**3.** I.R.S. § 167 provides two basic methods of calculating the annual depreciation deduction allowed with respect to the taxpayer's business property. Under the straight-line method, the taxpayer deducts an equal amount during each year of the asset's useful life. The yearly amount equals the asset's original cost, less its salvage value, divided by the number of years in its useful life. On the other hand, under an accelerated method of depreciation, the taxpayer is allowed to deduct amounts greater than those allowed under the straight-line method during the early years of the asset's useful life. However, because the total deduction over the asset's life may not exceed that under the straight-line method, smaller annual deductions are required during the later years of the asset's useful life. The taxes saved during the early years of the asset's life by using an accelerated depreciation method constitute the "deferred taxes" at stake in this appeal.

**4.** Normalization occurs when a utility uses an accelerated depreciation method for income tax purposes, but calculates its tax expense for ratemaking purposes as if it had taken straight-line depreciation. Thus, in the early years of an asset's life, the utility collects more from its ratepayers than it actually pays in taxes. This excess amount is then usually credited to a reserve account for deferred taxes. This reserve account serves at least two important functions. First, it implements the Congres-

es deferred by use of accelerated depreciation, with respect to property acquired after 1969.[5] However, the Commission disallowed the amount of "deferred" taxes as a tax expense, finding that the use of accelerated depreciation resulted in an actual tax "savings". Accordingly, the Commission's June 10 Decree increased the New England's net income by $3,612,000, thereby effecting a "flow-through"[6] of the "deferred" taxes to the ratepayers. New England now contends that the Commission's action will cause it to lose the right to take accelerated depreciation under I.R.C. § 167(*l*). Not only will this result in higher rates for the ratepayers, New England argues, but also it amounts to confiscation of its property. The Commission disagreed, finding that "this Commission's use of accelerated depreciation to compute income tax expense for rate-making purposes will not affect New England's right to use accelerated depreciation in computing its tax expense for I.R.S. purposes." *Re New England Telephone and Telegraph Co.,* —— P.U.R. 4th ——, —— (Me.Pub.Util.Comm. 1977).

A number of courts and regulatory bodies have assumed, without discussion, that action similar to that taken by the Commission would result in the utility's loss of its ability to take accelerated depreciation for federal income tax purposes.[7] We need not reach this substantive issue at this time, because we decide this case upon state law concerning the power of the Commission. We hold that the Commission's actions with respect to the accelerated depreciation issue constitute an abuse of its power and discretion in the ratemaking process.

Before proceeding to this Court's reasoning, a review of the historical background of § 167(*l*) is appropriate. As originally enacted in 1954, Pub.L. No. 83–591, § 167, 68A Stat. 51 (1954), § 167 of the Internal Revenue Code allowed a taxpayer to elect among different methods for the calculation of its depreciation deduction on eligible property. The basic options were between straight-line and a form of accelerated depreciation. One of Congress's stated reasons for the allowance of liberalized depreciation was to encourage the maintenance of a high level of investment in plant and equipment and thus to stimulate "economic growth, increased production, and a higher standard of living." *H.R.Rep. No. 1337,* 83d Cong., 2d Sess. 24 (1954); *S.Rep. No. 1622,* 83d Cong.2d Sess. 26 (1954); *reprinted in* [1954] *U.S.Code Cong. & Admin.News,* pp. 4048, 4656. *See Panhandle Eastern Pipe*

---

sional policy behind accelerated depreciation, of stimulating economic growth by providing a source of funds during the early years of an asset's life, which may be used by the utility for capital expansion. While there is no actual cash in the reserve, it serves as a bookkeeping device to account for the amount of the utility's capital which has been provided by the deferred taxes. Second, the reserve account provides a source of funds, for accounting purposes, with which to pay the utility's increased tax bills during the later years of the asset's life. This increased tax liability is caused by the fact that, under a normalization method of accounting for ratemaking purposes, a crossover point is reached, when actual taxes paid by the utility begin to exceed revenues collected for taxes.

5. I.R.C. § 167(*l*), the governing subsection of § 167, distinguishes between property acquired after 1969 and property acquired before 1970. *See Mechanic Falls Water Co. v. Public Utilities Commission, supra,* for a discussion of ratemaking practices for pre-1970 property. No pre-1970 property is involved in this case,

because the Company never used accelerated depreciation before 1970.

6. Flow-through is a ratemaking technique by which rates are based upon the *actual* taxes to be paid in that year by a utility taking accelerated depreciation. The tax "savings" are credited to income, thereby reducing the utility's revenue requirement. In theory, this results in lower rates during the early years of an asset's useful life, but in higher rates after the crossover point has been reached.

7. *See Memphis Light, Gas and Water Division v. Federal Power Commission,* 149 U.S.App. D.C. 238, 462 F.2d 853 (1972), *rev'd on other grounds,* 411 U.S. 458, 93 S.Ct. 1723, 36 L.Ed.2d 426 (1973); *City and County of San Francisco v. Public Utilities Commission,* 6 Cal.3d 119, 98 Cal.Rptr. 286, 490 P.2d 798 (1971); *City of Akron v. Public Utilities Commission,* 51 Ohio St.2d 27, 364 N.E.2d 869 (1977); *Re South Central Bell Telephone Company,* 83 P.U.R.3d 317 (Ala.Pub.Serv.Comm. 1970).

Line Co. v. Federal Power Commission, 115 U.S.App.D.C. 8, 11, 316 F.2d 659, 662 (D.C. Cir.1963), cert. denied 375 U.S. 881, 84 S.Ct. 147, 11 L.Ed.2d 111 (1963). As originally enacted, § 167 addressed all taxpayers, without special reference to utilities or to the method of calculating their taxes for ratemaking purposes. It was thus possible to conclude that, given the "regulated quasi-monopoly" nature of utilities, which presumably allowed them to adequately recover their costs from the ratepayers, the Congressional intention to encourage expansion did not necessarily extend to regulated utilities. City of Pittsburgh v. Pennsylvania Public Utility Commission, 182 Pa.Super. 551, 568–576, 128 A.2d 372, 380–4 (1956); Accord, City of Alton v. Commerce Commission, 19 Ill.2d 76, 83–85, 165 N.E.2d 513, 520–2 (1960).

In the 1957 case of Central Maine Power Co. v. Public Utilities Commission, supra, (1957), we upheld a Commission decision denying the inclusion of deferred taxes in the company's operating expenses, thereby causing the flow-through of such tax "savings" to the ratepayers. At that time we noted that

> we are unable to find an intent on the part of Congress that the ratepayers of a regulated utility should provide an interest free loan to the Company through present payment of a deferred tax. 153 Me. at 248, 136 A.2d at 738.

Thus, it became Commission policy to require the immediate flow-through of taxes "saved" by use of accelerated depreciation. In the light of these circumstances, New England continued to take only straight-line depreciation through the 1960's.

In some cases, in fact, state commissions went even further than requiring a utility already taking accelerated depreciation to flow-through. Where a commission felt that management had abused its discretion or had been imprudent in taking straight-line depreciation for tax purposes, it sometimes imputed flow-through by setting rates as though the utility had used accelerated depreciation with flow-through. See Re General Telephone Co. of California, 80 P.U.R.3d 2, 50–52 (Cal.Pub.Util.Comm. 1969); Re Pacific Telephone and Telegraph Co., 77 P.U.R.3d 1, 11–13 (Cal.Pub.Util. Comm.1968); Re Bangor Hydro-Electric Co., 26 P.U.R.3d 489, 492–95 (Me.Pub.Util. Comm.1958); But see Washington Utilities and Transportation Commission v. Pacific Northwest Bell Telephone Co., 81 P.U.R.3d 371, 386 (Wash.Util. and Transp.Comm. 1969) where the Commission refused to impute flow-through in view of the pendency of the Tax Reform Act of 1969. In at least one instance imputation of accelerated depreciation with flow-through, to a utility which had switched to straight-line depreciation in order to avoid the consequences of flow-through, was judicially approved. See Midwestern Gas Transmission Co. v. Federal Power Commission, 388 F.2d 444 (7th Cir. 1968), cert. denied, 392 U.S. 928, 88 S.Ct. 2286, 20 L.Ed.2d 1386 (1968). It is against this background that § 167(l) was enacted as a part of the Tax Reform Act of 1969.[8]

The legislation originally proposed in 1969, H.R. 6659, which formed the basis for extensive hearings before the House Committee on Ways and Means, directed itself explicitly to the actions which regulatory

8. As of September 1, 1968, twenty states required normalization, seventeen required flow-through, and thirteen state commissions had taken no action whatsoever. The Federal Power Commission had ordered flow-through for both rate and accounting treatment. The Securities and Exchange Commission allowed either normalization or flow-through for accounting purposes but had taken no action in regard to rates. The Federal Communications Commission took no action on rate treatment, although it stated that failure to take accelerated depreciation for tax purposes was taken, into account in setting the rate of return. The Civil Aeronautics Board ordered normalization for rates but took no action on accounting treatment. The Interstate Commerce Commission required flow-through for both ratemaking and accounting purposes. Canada ordered normalization for both. Treatment of Tax Depreciation by House Regulatory Agencies: Hearings on H.R. 6659 Before the Comm. on Ways and Means, 91st Cong., 1st Sess. 3907–08 (1969) (statement of Reeves Ritchie).

Neither the American Telephone and Telegraph Co. nor most of its subsidiaries took accelerated depreciation prior to the passage of the Tax Reform Act.

commissions themselves might take in regard to the use of accelerated depreciation for rate-making purposes. The proposal, entitled "A Bill to confirm the purpose of the accelerated depreciation provisions of the Internal Revenue Code, and to avoid loss to the Federal revenues in the case of regulated taxpayers through the application of these provisions contrary to the intent of Congress," provided in pertinent part that:

. . . no agency, instrumentality, commission, or other similar body with authority to establish or approve the rates of any taxpayer shall, without the consent of such taxpayer—

(a) specify, or prohibit a change of, the method or rate of depreciation, allowable under the Internal Revenue Code, to be used by such taxpayer in computing the amount of its Federal income tax;

(b) determine such taxpayer's expense for Federal income taxes paid, or to be paid, for any period in establishing such taxpayer's cost of service (either to determine its overall rate of return or to reflect operating results in its books of account)—

(1) by using or considering the availability of any method or rate of depreciation allowable under the Internal Revenue Code other than that used, or proposed to be used, by such taxpayer in computing its Federal income tax for such period, or

(2) in the case of any taxpayer which uses, or proposes to use, one of the methods or rates referred to in section 167(b)(2), (3), and (4), by excluding from such tax expense the amount of any reduction in Federal income tax payable for such period attributable to the allowance of such method or rate;

(c) accomplish a result similar to those proscribed by paragraph (a) or (b) by any other treatment, device, or procedure.

As the bill was originally worded, concerns were expressed over Congress's authority to directly interfere with the rate-making policies of state regulatory agencies. Accordingly, as finally enacted, § 167(*l*), Pub.L. No. 91–172, Title IV, § 441(a), 83 Stat. 625 (1969), was limited expressly to the methods of depreciation available to the utilities themselves. Any effect upon regulatory agency policies was to be as an indirect result of the statute's provisions concerning the availability of various depreciation methods to the utilities they regulated. *See Federal Power Commission v. Memphis Light, Gas and Water Division, supra,* 411 U.S. at 465, 93 S.Ct. 1723.

Soon after the enactment of § 167(*l*), New England switched from straight-line to accelerated depreciation with normalization on all post-1969 property. In 1970 the Commission issued a Statement of Policy authorizing utilities to normalize accelerated depreciation under § 167(*l*). However, since that time, the Commission has ordered the flow-through of (1) deferred taxes on pre-1970 property, *Re Mechanic Falls Water Co.,* 13 P.U.R.4th 347, 361 (Me.Pub.Util. Comm.1976), *aff'd in part, rev'd in part on other grounds, Mechanic Falls Water Co. v. Public Utilities Commission, supra* ; (2) deferred taxes arising under the State income tax, *Re Central Maine Power Co.,* 15 P.U.R.4th 455, 472–4 (Me.Pub.Util.Comm.1976), *aff'd Central Maine Power Co. v. Public Utilities Commission, supra* (1978); and (3) deferred taxes on all property for State and federal income tax purposes where the utility failed to make an election under § 167, *Re Mars Hill and Blaine Water Co.,* 19 P.U.R.4th 380 (Me.Pub.Util.Comm.1977). However, in each of these cases, the Commission indicated agreement with the fact that a requirement of flow-through would preclude a utility's ability under § 167(*l*) to take accelerated depreciation with respect to post-1969 property. Until the issuance of its decree below, the Commission's practice with regard to New England was to use straight-line depreciation in computing its federal income tax expense for ratemaking purposes (normalization) and to deduct the deferred tax reserve from its rate base. Now the Commission proposes, in effect, to require the flow-through of such "deferred" taxes to the ratepayers.

The governing paragraph of § 167(*l*) provides:

> *Post-1969 public utility property.*—In the case of any post-1969 public utility property, the term "reasonable [depreciation] allowance" as used in subsection (a) means an allowance computed under—
>
> (A) a subsection (1) method [straight-line],
>
> (B) a method otherwise allowable under this section [accelerated] if the taxpayer uses a normalization method of accounting, or
>
> (C) the applicable 1968 method, if, with respect to its pre-1970 public utility property of the same (or similar) kind most recently placed in service, the taxpayer used a flow-through method of accounting for its July 1969 accounting period.

I.R.C. § 167(*l*)(2). Since the Company did not use accelerated depreciation with respect to its pre-1970 property, subparagraph (C) is inapplicable. Therefore, two depreciation methods are available to the Company with respect to its post-1969 property: straight-line depreciation or accelerated depreciation with "normalization."

The only means by which the Company may take accelerated depreciation is if it "uses a normalization method of accounting," which is defined by the statute:

> *Normalization method of accounting.*—In order to use a normalization method of accounting with respect to any public utility property—
>
> (i) the taxpayer must use the same method of depreciation to compute both its tax expense and its depreciation expense for purposes of establishing its cost of service for ratemaking purposes and for reflecting operating results in its regulated books of account, and
>
> (ii) if, to compute its allowance for depreciation under this section, it uses a

method of depreciation other than the method it used for the purposes described in clause (i), the taxpayer must make adjustments to a reserve to reflect the deferral of taxes resulting from the use of such different methods of depreciation. I.R.C. § 167(*l*)(3)(G). *Compare* § 167(*l*)(3)(H) (flow-through method of accounting).

The question then becomes whether New England will be using a "normalization method of accounting", as defined by the statute and as intended by Congress.

The Commission argues that, despite its use of flow-through for determining federal income tax expense, New England will continue to use a "normalized method of accounting" for purposes of § 167(*l*). In its decree, the Commission ordered

> that New England continue to use a normalized method of accounting. Thus New England will continue to use the same method of depreciation to compute both its tax expense and its depreciation expense for purposes of establishing its cost of service, i. e., its requests for rates to this Commission, and for reflecting operating results in its regulated books of account. New England will, therefore, also continue to make adjustments to its deferred tax reserve. *Re New England Telephone and Telegraph Co., supra,* —— P.U.R.4th at ——.

According to New England's regulated books of account, the Commission reasons, it will be using a normalization method of accounting. However, for purposes of determining New England's federal income tax expense the Commission would impute flow-through of the tax "savings".

The Commission reasoned that § 167(*l*) was directed solely to the accounting and bookkeeping activities of the taxpayer-utility and had no bearing upon the Commission's ratemaking determinations.[9] Thus,

---

9. The Commission's brief argues:

The plain words of the statute refer to the method of depreciation "the *taxpayer* must use . . . to compute . . . its tax tax [sic] expense . . . for purposes of establishing its cost of service for ratemaking

purposes." § 167(*l*)(3)(G). This language must refer to the method of depreciation the taxpayer utility uses in filing a rate increase application with the Commission since that is the only instance when the *taxpayer utility* establishes its cost of service for ratemaking

the Commission argues that it may set New England's rates on the basis that the deferred taxes are being credited to income (flowed-through), as long as New England's books indicate that it is following the straight-line method of accounting (normalization) on paper. The Commission decided, that after requiring New England to comply with these provisions, it was free to disregard the Company's book cost of service and could, in effect, impute flow-through.

■ The Commission is not free to disregard New England's books of account in this case. Ordering New England to keep its books by one method and, at the same time, setting rates by another method was an arbitrary exercise of the Commission's power and constituted an abuse of its discretion.

■ We do recognize that the Commission is empowered by the Legislature to prescribe the method of accounting to be used by utilities subject to its jurisdiction. 35 M.R.S.A. §§ 53–60. We also recognize that, generally, a regulatory agency is not bound by a utility's books of account while setting rates. *Mechanic Falls Water Co. v. Public Utilities Commission, supra* at 1102. This is because ratemaking is a legislative function which must be based upon an investigation and ascertainment of the utility's true financial condition.

In order to carry out its ratemaking obligation, a regulatory commission must be able to go beyond the utility's books of account. However, this is not what motivated the Commission in this case. The Commission did not disregard New England's books in this case in order to determine its actual financial condition. Rather, it sought to avoid the consequences of § 167(*1*) by using one accounting method for ratemaking and another for bookkeeping. The Commission cannot be permitted to treat the regulated books of account so lightly. Such *arbitrary* action constitutes an abuse of the Commission's power.

■ No adequate explanation appears to justify the action taken by the Commission. As this Court said in *New England Telephone and Telegraph Co. v. Public Utilities Commission*, 148 Me. 374, 94 A.2d 801 (1953), the Commission's method of approach

> leads almost inevitably to the errors of which the Commission has been responsible here. It has been more concerned with the result at which it was going to arrive than with the methods by which it reaches that result. *Id.* at 403, 94 A.2d at 815.

As we stated, this is *not* a case in which the Commission has disregarded a utility's books of account in order to determine the utility's true financial condition. Rather, in this case, New England's books would apparently be in compliance with the Commission's order, which the Commission would then choose to disregard. The Commission's ratemaking powers do not extend this far. Once it has ordered a utility to maintain its books of account by a certain method and the utility complies, the Commission cannot arbitrarily choose to set rates by another method.

A utility must be able to rely upon its good faith compliance with accounting methods prescribed by the Commission, and not be subjected to *arbitrary* changes for ratemaking purposes. The law requires that

> No public utility shall keep any other books, accounts, papers or records of its business transacted than those prescribed or approved by the commission. 35 M.R.S.A. § 57.

It follows that a utility which complies with such orders must be able to rely upon these

purposes. NET would have this Court ignore the plain words of the statute and make this requirement refer to the method of depreciation the *Commission* used in fixing just and reasonable rates. While Congress could have worded the statute so as to refer to the method of depreciation the Commission used in fixing just and reasonable rates, it did not. Instead it limited itself to looking at the method of depreciation the *taxpayer* used when it established cost of service for ratemaking purposes, i. e., for purposes for filing rates.

records for all purposes, including rate proceedings. The Commission's action in this case arbitrarily interfered with such reliance and constitutes an abuse of discretion.

We also find that the Commission's actions constituted an abuse of discretion for a second reason. As we have noted, a number of court and commission decisions have indicated that action, similar to that taken by the Commission in this case, would result in New England's loss of its ability to take accelerated depreciation for federal income tax purposes.[10] Such a conclusion finds considerable support in Congressional statements of intent accompanying the bill.[11]

Strong argument may be made that the Commission's actions *will* deprive New England of its ability to take accelerated depreciation.

We find that there is a reasonable likelihood that New England would lose its ability to take accelerated depreciation or, at least, be subject to federal action with respect thereto. The effect of the Commission's decree, if sustained by this Court, would be, at least, to place New England in jeopardy of losing its ability to take accelerated depreciation for federal income tax purposes.

10. See n.7, *supra.*

11. The House report states:
 In the case of new property (property completed or acquired after December 31, 1969) the bill provides that if the taxpayer presently flows through to its customers the benefits of deferred taxation, then it must stay on accelerated depreciation and flow through unless the regulatory agency permits it to change. In all other cases, accelerated depreciation is to be permitted only if the utility normalizes the deferred income taxes. (The taxpayer will be permitted to elect straight line depreciation as to such new property and, if the taxpayer seeks to use accelerated depreciation, the regulatory agency will be permitted to in effect force the taxpayer to straight line depreciation by not permitting normalization. The regulatory agency will not, in such cases, be permitted to require flow through of deferred taxes.)
 H.R.Rep. No. 91–413, 91st Cong., 1st Sess. (1969), *reprinted in* [1969] *U.S.Code Cong. & Admin.News,* pp. 1783–4.
 Moreover, the Senate report adds:

The Commission's treatment of accelerated depreciation in this case was to act directly contrary to the national economic policy set by the Congress of the United States. No reasonable justification for the action taken can be found in the record.

■ In conclusion, we find that the Commission's actions with respect to the accelerated depreciation issue constitute an unreasonable exercise of power and abuse of discretion for two reasons. First, it *arbitrarily* disregarded the normalization method of accounting, which it had ordered New England to follow. Second, it arbitrarily placed New England in jeopardy of losing its ability to take accelerated depreciation. In view of our decision that the Commission's actions were arbitrary with regard to the treatment of the accelerated depreciation issue it becomes unnecessary for us to decide whether under the Internal Revenue Code, New England would lose its right to take accelerated depreciation if the Commission persisted in imputing flow-through of the taxes deferred. Even though all indications, including the language of the Code and the stated purposes of § 167(*l*), strongly suggest that result would obtain, it is unnecessary for us in this case to so declare. We remand the case to the Commission with instructions to recompute New

 The committee amendments provide that the requirement of normalizing is not met by simply normalizing the regulated books of account of the utility if these books of account may be ignored by the regulatory agency in setting rates. Under the committee amendments, while the regulated books of account are to be used as the basic source of information, these books are not to control if the current rates of the utility are set by reference to the flow-through method. This is done because the use of flow-through in setting rates would produce the revenue loss the bill seeks to avert.
 S.Rep. No. 91–552, 91st Cong., 1st Sess. (1969), *reprinted in* [1969] *U.S.Code Cong. & Admin. News,* p. 2206. The conference bill followed the Senate amendments on most points, including apparently, the amendments so noted in the report. *Conf.Rep. No. 91–782,* 91st Cong., 1st Sess. (1969), *reprinted in* [1969] *U.S.Code Cong. & Admin.News,* p. 2427.

England's tax expense for ratemaking purposes, according to the method of accounting which it requires New England to follow in its regulated books of account to wit: by the use of accelerated depreciation without flow-through.

## II.

. ALLOCATION OF AMERICAN TELEPHONE & TELEGRAPH INTEREST

As we have seen with respect to the accelerated depreciation issue, an important component of New England's "operating expenses," which must be paid by its ratepayers, is its federal income tax expense. One of the calculations New England must make in order to determine its taxable income, and corresponding federal tax liability, is to deduct its interest payments from gross income.

Thus, a large interest expense benefits New England's ratepayers by substantially reducing its tax liability and operating expenses. New England claims that its interest expenses must be limited to only interest that it pays on debt issued by New England itself. However, the Commission's calculation of New England's interest expense included not only interest payments on its own debt, but also an allocation of American Telephone & Telegraph's interest expense. We hold that the Commission's interest allocation adjustment was reasonable and its findings, with respect thereto, supported by substantial evidence, with one exception, which requires remand.

Before proceeding to the legality of the Commission's actions in this case, an explanation of the method by which New England pays its federal income tax is necessary.

The Internal Revenue Code, I.R.C. §§ 1501 et seq. allows affiliated corporations to file income tax returns on a consolidated basis. Accordingly, New England joins with American Telephone & Telegraph and other members of the Bell System in filing a consolidated return, in which the taxable incomes of the profit companies and the negative taxable incomes of the loss companies are totalled. Because the taxable incomes of some companies may be offset by the tax losses of other companies in the affiliated group, the effect is to lower the overall federal taxes paid to the federal government by the Bell System as a whole below the amount of taxes which would be paid if each of the companies filed a separate return. The Bell System then pays the corporate tax rate of 48% on the net consolidated income of the entire group.

American Telephone and Telegraph acts as an agent for its subsidiaries and, pursuant to an agreement among the members of the system, allocates the tax liability among the various companies according to a prearranged formula. The profit companies are essentially "charged" the amount they would have paid if they had filed a separate return, i. e., 48% of taxable income. AT&T then directs them to distribute the money to two different recipients. The profit company might be directed to pay part or all of the money directly to the federal government to satisfy the System's federal income tax liability on the consolidated return. In the alternative, American Telephone & Telegraph might direct the balance of the money to be paid to one of the tax loss companies, in the amount of 48% of its negative taxable income. Thus, the tax loss companies are compensated in the amount by which their losses reduced the System's overall tax liability.

In effect, American Telephone & Telegraph collects 48% of the sum of all positive taxable incomes, which is the amount the individual companies would have collectively paid if all members of the System had filed separate returns. But, because the consolidated return system also includes tax loss companies, the actual payments to the federal government total less than 48% of all positive taxable incomes. The tax savings so realized by filing a consolidated return are kept in the System and distributed to only those companies which contributed negative taxable incomes to the consolidated return. Thus, American Telephone & Telegraph is collecting more in "income taxes" from its profit making subsidiaries

than are necessary to meet the System's consolidated tax liability. Yet, the profit companies are not allowed to participate in such tax savings generated by use of the consolidated return.

One method used by regulatory agencies to account for what is perceived to be an inequitable distribution of the tax savings among all the members of the consolidated system involves the application of an "effective tax rate." We recently affirmed the Commission's application of an effective tax rate in *Mechanic Falls Water Co. v. Public Utilities Commission*, Me., 381 A.2d 1080 (1977). An effective tax rate is generally determined by dividing the total consolidated tax liability, before credits, by the sum of the positive taxable incomes. Although various methods may be used to compute an effective tax rate, *id.* at 1095, n. 26, the general purpose is to allocate to the utility in question its proportionate share of the tax liability on the consolidated return. The resulting percentage figure (usually expected to be below 48%) is the rate which, if multiplied by the taxable incomes of the profit companies, would produce just enough money to meet the consolidated system's actual federal tax bill, and no more. This "effective tax rate" is then used instead of the 48% federal corporate tax figure to determine the utility's federal tax expense for ratemaking purposes.[12]

In this case, however, the Commission decided not to use the effective tax rate method to allocate to New England the savings resulting from the use of a consolidated return. As we have seen, the effective tax rate is a method to distribute the tax savings resulting from the existence of tax loss companies, with negative taxable incomes, in the consolidated return. The method chosen by the Commission in this case was designed to allocate to New England one particular item which contributed to the consolidated system's tax savings, *i. e.* interest paid on debt issued by American

Telephone & Telegraph itself. The Commission reasoned that because New England's ratepayers paid part of the interest on American Telephone & Telegraph's issued debt, they should be entitled to have those interest payments deducted from New England's taxable income, thereby reducing its federal income tax expense for ratemaking purposes.

The Commission's interest expense allocation basically follows the theory behind its double leveraging adjustment, but is not necessarily dependent upon our approval thereof. American Telephone & Telegraph owns 86% of New England's common equity, which comprises 55% of New England's capital structure. Therefore, 47.3% (86% × 55%) of New England's capital structure and, therefore, its rate base is financed by American Telephone & Telegraph capital. Because 25% of American Telephone & Telegraph's own capital structure consists of long term debt, with an interest cost of 6.5%,[13] the Commission determined that 11.8% (25% × 47.3%) of New England's capital structure is financed by debt issued by American Telephone & Telegraph. The Commission reasons that when New England's ratepayers supply revenues which are used to provide American Telephone & Telegraph with a return on its equity investment in New England, 25% of that return is being used by American Telephone & Telegraph to pay the interest on its own debt. The Commission maintains that New England's ratepayers are entitled to an interest deduction on that portion of American Telephone & Telegraph debt which they indirectly finance.

The Commission calculated that 11.8% of New England's $214,615,000 rate base or $25,324,570 was attributable to American Telephone & Telegraph debt on which New England's ratepayers were paying interest at a rate of 6.5%. Therefore, New England's ratepayers paid approximately

---

12. The Supreme Court approved the effective tax rate approach in *Federal Power Commission v. United Gas Pipe Line Co.,* 386 U.S. 237, 87 S.Ct. 1003, 18 L.Ed.2d 18 (1967). *See also,* 1

A. Priest, *Principles of Public Utility Regulation* 54–59 (1969).

13. We reserve our doubts as to the validity of the 6.5% figure at this time.

$1,650,000 in interest on American Telephone & Telegraph debt during the test year. The Commission then added this allocated interest expense to the interest expense on debt issued by New England itself to determine New England's total interest expense for ratemaking purposes. Thus, the Commission reduced New England's federal income tax expense to reflect the contribution made by its ratepayers to interest payments on American Telephone & Telegraph issued debt.

New England challenges the Commission's allocation of interest expense on American Telephone & Telegraph's issued debt on a number of grounds. We deny its appeal on this issue, holding that the Commission's actions constituted reasonable ratemaking practice and were generally supported by substantial evidence in the record.[14]

Rather than calculate an overall effective tax rate, a number of commissions have focused upon allocating a parent corporation's interest expense to a subsidiary utility as a means of distributing the tax savings when a consolidated return has been filed. A common method to allocate the interest expense on debt issued by the parent is to adopt a higher hypothetical debt ratio for the utility and to calculate its debt expense thereby.

Notably in Bell Telephone cases, hypothetical debt ratios have been used with some frequency for the purpose of allocating to particular operating companies the income tax savings which are produced by consolidated income tax returns. 1 A. Priest, *Principles of Public Utility Regulation* 54 (1969).

A number of commissions follow an adjustment recommended by an accounting committee of the National Association of Railroad and Utility Commissions (NARUC).[15] The NARUC adjustment

use[s] the cost of debt and debt ratio of the Bell System rather than the debt ratio and operating expenses of a particular operating company. *Re Chesapeake & Potomac Telephone Company*, 4 P.U.R. 4th 1, 40 (Dist. of Col.Pub.Serv.Comm. 1974).

Similarly, some cases use the debt ratio of the utility's parent or the consolidated system to determine the utility's proper interest expense for federal tax purposes.[16] Finally, a few cases state that they are allocating part of the parent's interest expense

---

**14.** At this point we must note that we would not approve the Commission's "tracing" of debt expense through two corporate structures if New England had not filed a consolidated return with American Telephone & Telegraph. We view the interest expense allocation in this case as a reasonable method to distribute tax savings occasioned by the filing of a consolidated federal income tax return and not as an outgrowth of the Commission's double leveraging adjustment.

If New England and American Telephone & Telegraph had filed separate returns the Commission could not reduce New England's federal income tax expense by allocating American Telephone & Telegraph's debt expense, because New England would be entitled to recover all legitimate federal taxes which it must pay. But where the companies file a consolidated return, we have no such concern because they have chosen to be treated as a single entity for tax purposes, including consolidation of taxable incomes and allocation of tax savings. *See Federal Power Commission v. United Gas Pipe Line Co., supra,* 386 U.S. at 243, 87 S.Ct. 1003.

**15.** *Chesapeake and Potomac Telephone Company of Maryland v. Public Service Commission*, 230 Md. 395, 411–412, 187 A.2d 475, 484–5 (1963); *South Central Bell Telephone Company v. Tennessee Public Service Commission*, 100 P.U.R. 3d 45, 53–5 (Tenn.Chan.Ct. 1973); *Re Mountain States Telephone & Telegraph Company*, 11 P.U.R. 4th 1, 21–4 (Colo. Pub.Util.Comm.1975); *Re Southwestern Bell Telephone Company*, 98 P.U.R. 3d 30, 42 (Kan. State Corp.Comm.1973); *Re The Chesapeake & Potomac Telephone Company of Maryland*, 10 P.U.R. 4th 211, 215 (Md.Pub.Serv.Comm.1975). *See also, Priest, supra* at 55–6, n. 27.

**16.** *Citizens of Florida v. Hawkins,* 356 So.2d 254, 258–60 (Fla.1978); *Southwestern Bell Telephone Company v. State Corporation Commission,* 192 Kan. 39, 70, 386 P.2d 515, 543–4 (1963); *Re Chesapeake & Potomac Telephone Company,* 4 P.U.R. 4th 1, 36–41 (Dist. of Col. Pub.Serv.Comm.1974); *Re Southern Bell Telephone and Telegraph Company,* 12 P.U.R. 4th 252, 262 (Fla.Pub.Serv.Comm.1975); *Priest, supra* at 56, n. 28.

to the subsidiary utility, but are unclear as to the precise method followed.[17]

In this case the Commission stated that it preferred not to use a hypothetical debt ratio, but to use

> the actual debt ratio of the Company adjusted for that specific portion of New England Telephone's equity which is financed by American Telephone and Telegraph Company debt. *Re New England Telephone and Telegraph Co.,* —— P.U.R. 4th ——, —— (Me.Pub.Util.Comm.1977).

Thus, the Commission chose to follow a method used by the New York Public Service Commission in *Re New York Telephone Company,* 84 P.U.R. 3d 321 (N.Y.Pub.Serv. Comm.1970).[18] In that case the New York Commission concluded,

> Since NYT's ratepayers pay the cost of (i. e., the return on) NYT's equity, a part of which AT&T converts into debt in its own capital structure, . . . the company's ratepayers deserve the tax benefits of the related AT&T deduction for interest on the debt. *Id.* at 345.

The New York Commission then rejected the NARUC and imputed debt ratio approaches and calculated New York Telephone's share of American Telephone & Telegraph's interest deductions by the same method used by the Commission in this case. This method is essentially an application of a double leveraging formula for purposes of determining the utility's proportionate share of interest deductions associated with debt issued by the parent, upon which the utility's ratepayers indirectly make the interest payments.[19]

Neither the Commission nor our own research brought to our attention any other case in which a double leveraging type approach was used to allocate interest expense to a subsidiary utility for deduction from taxable income. However, the theory behind the double leverage formula here, *i. e.,* to account for interest paid by New England's ratepayers on that debt issued by American Telephone & Telegraph which is used to fund American Telephone & Telegraph's equity investment in New England, finds support in a number of cases. In *Southwestern Bell Telephone Company v. State Corporation Commission, supra* n. 16, the Kansas Supreme Court affirmed that state's commission's use of the consolidated system's debt ratio to allocate interest expense to the operating company. The Court noted that

> when the parent company and its subsidiaries elect to file a joint income tax return, they have disregarded their separate entities for income tax purposes. At least they have for tax purposes combined their income and expense. *It is evident also that the parent company has used long term indebtedness, on which the interest is deductible from income as expense, with which to buy the common stock of its subsidiaries whose income tax*

---

**17.** *Re Southwestern Bell Telephone Company,* 10 P.U.R. 4th 323, 327 (Ark.Pub.Serv.Comm. 1975); *Long Island Water Corp. v. Public Service Commission,* 49 App.Div.2d 392, 374 N.Y. S.2d 841 (1975).

**18.** Whether this is the same method approved by the New York Supreme Court, Appellate Division, in *Long Island Water Corp. v. Public Service Commission, supra* n. 17 is unclear.

**19.** New England implies that the validity of the interest allocation (based upon a double leveraging formula) depends upon our approval of the Commission's use of its double leveraging adjustment in general. We disagree. The use of double leveraging to determine an appropriate rate of return and its use to allocate interest expense represent two different issues, which must be judged on their own merits. More-

over, we do not reject the general concept of double leveraging to determine rate of return, but only reject the Commission's use of a double leveraging adjustment in this case where the record was inadequate and the Commission failed to give sufficient consideration to the existence of the 14% minority. The existence of a 14% minority does not raise the same concerns here where the issue is not the appropriate return to such shareholders, but, rather, concerns New England's proper allocation of American Telephone & Telegraph debt expense. *See Mountain States Telephone & Telegraph Company v. Public Utilities Commission,* 576 P.2d 544, 551 (Colo.1978), in which the court rejected the Company's argument that use of an effective tax rate discriminated against its minority shareholders.

*is paid by its consumers as a chargeable expense. Id.* at 543 (emphasis added).[20]

It appears to be accepted regulatory practice to allocate the interest deduction on debt issued by American Telephone & Telegraph to a subsidiary whose ratepayers indirectly pay the interest on such debt through the return to American Telephone & Telegraph on its investment in the subsidiary. In fact, a Minnesota District Court held that the Minnesota Public Service Commission erred when it refused to adjust the utility's federal tax expense to reflect interest deductions on debt issued by American Telephone & Telegraph. *Re Northwestern Bell Telephone Company,* 9 P.U.R. 4th 427, 440–43 (Minn.Dist.Ct.1975), *aff'd Northwestern Bell Telephone Company v. State,* 253 N.W.2d 815 (Minn.1977). The Minnesota Supreme Court affirmed, stating:

> [T]he district court was endeavoring to adequately account for Bell's actual tax liability under the consolidated return. A number of cases have considered the effect of this method of tax reporting. [citations omitted] These cases hold generally that when a consolidated return is filed, the subsidiary should not be allowed to receive credit for more than its proportionate share of the consolidated tax liability . . . [citation omitted] The district court properly limited Bell to a deduction from operating income of only its proportionate share of the consolidated AT&T tax liability. *Id.* at 821.

 Accordingly, we are satisfied that the Commission may reasonably adjust New England's federal tax expense to reflect an allocation of American Telephone & Telegraph's issued debt upon which New England's ratepayers pay the interest. (Cases relied upon by New England,[21] are in the clear minority, and fail to persuade us on

this point). We also find that the Commission's method for determining the appropriate allocation of American Telephone & Telegraph's interest expense to New England was reasonable. As we have seen earlier, double leveraging is a viable ratemaking concept to account for the parent-subsidiary relationship in some cases. It may be reasonably used in this case by the Commission to trace the source of the money used to pay the interest debt issued by American Telephone & Telegraph. When New England and American Telephone & Telegraph filed a consolidated return, they submitted themselves to treatment as a single entity for federal tax purposes. In such a situation the Commission may allocate American Telephone & Telegraph's interest expense so as to provide New England's ratepayers with the benefit of the interest deduction resulting from their own rate payments. We hold that the Commission's allocation of American Telephone & Telegraph's interest expense in this case was a reasonable ratemaking adjustment.

 After we have determined the reasonableness of the Commission's allocation of American Telephone & Telegraph's interest expense, the only remaining question is whether it is supported by substantial evidence. New England argues that no witness recommended the recomputation of its federal income taxes on the basis of the double leverage formula. However, the testimony of staff witness, Mr. Bruce M. Louiselle, indicated that the double leverage approach was a valid alternative. Moreover, the Commission generated a considerable record on the interest allocation issue, which demonstrates its familiarity with the basic issues and concepts involved. The testimony and exhibits incorporated into the record on this issue provide a sufficient foundation for the Commission's ac-

---

20. *See also, South Central Bell Telephone Company v. Tennessee Public Service Commission,* 100 P.U.R. 3d 45, 54–55 (Tenn.Chan.Ct.1973); *Re Mountain States Telephone & Telegraph Company,* 11 P.U.R. 4th 1, 22–23 (Colo.Pub. Util.Com.1975); *Re Chesapeake & Potomac Telephone Company,* 4 P.U.R. 4th 1, 37 (Dist. of Col.Pub.Serv.Comm.1974).

21. *Re Diamond State Telephone Co.,* 51 Del. 525, 149 A.2d 324 (1959); *Indiana Public Service Commission v. Indiana Bell Telephone Co.,* 235 Ind. 1, 130 N.E.2d 467 (1955); *General Telephone Co. v. Public Utilities Commission,* 174 Ohio St. 575, 191 N.E.2d 341 (1963).

tions. The Commission is not required to follow only methodologies suggested by the witnesses before it. To bind the Commission to only those ratemaking techniques to which the witnesses testify would be an impermissible attempt to limit the discretion entrusted to it by the Legislature. The Commission must exercise its own expertise and skill in the setting of rates; and, we may not interfere with its decisions if they are reasonable and supported by substantial evidence. We have found the Commission's interest allocation to be reasonable in this case. We also find it to be supported by substantial evidence in the record, with one exception.

As we note in our discussion of the Commission's double leverage adjustment with respect to rate of return, the record with respect to American Telephone & Telegraph's cost of debt appears weak. The Commission appears to have adopted the 6.5% figure used in its double leverage adjustment, which, in turn, was adopted from Mr. Kosh's suggested double leverage calculation which uses a 6.5% cost for American Telephone & Telegraph's debt. However, there appears to be no explanation concerning the origin of the 6.5% figure and our search of the record has been unsuccessful in this respect.

Therefore, we affirm the Commission's interest allocation adjustment, on the condition that it make a finding supported by the evidence in the record as to the cost of American Telephone & Telegraph's debt, and that it incorporate such finding into its calculation of the interest allocation.

### III.

### RATE OF RETURN

We recently explained the function of "rate of return" in *Mechanic Falls Water Co. v. Public Utilities Commission,* Me., 381 A.2d 1080 (1977).

It is essential that a public utility's rates should provide sufficient revenue to cover the company's total costs properly incurred in furnishing the particular utility service. The costs include the operat-

ing expenses of the utility and a proper "return" on the utility's investment. This return is computed by multiplying a utility's "rate base" by its "rate of return." *Central Main Power Co. v. Public Utilities Commission,* 156 Me. 295, 306, 163 A.2d 762, 769 (1960). Maine statutorily provides for an original cost rate base which is the cost of the utility's property when it is first devoted to public use. 35 M.R.S.A. § 52. The rate of return is the rate that a utility is entitled to earn on its investment. It is determined by combining the capital structure of the utility with the proper cost of capital. *Id.* at 1095.

Rate of return is expressed as a percentage figure and denotes the annual return to be allowed on the value of the utility's property devoted to public use. It might be considered as the interest rate which the utility earns on its investment in property serving the public. One of the primary functions of utility regulatory agencies in ratemaking proceedings is to determine the appropriate rate of return to be allowed the utilities under their jurisdiction.

The determination of an appropriate rate of return may involve the consideration of a number of factors, the proper application of which has been the subject of considerable disagreement. *See* E. Nichols, *Ruling Principles of Utility Regulation,* ch. 4, § 1 (1955). The rate of return must not be so low as to constitute an unconstitutional confiscation of private property.

The Company is entitled to a fair return, and less than a fair return would be confiscatory. *Central Maine Power Co. v. Public Utilities Commission,* 153 Me. 228, 250, 136 A.2d 726, 739 (1957).

But, on the other hand, it must not be so high as to constitute an unreasonable burden on the ratepayers. The utility is entitled to only those rates which are "just and reasonable" under the circumstances. 35 M.R.S.A. § 51. Accordingly,

the Commission must strike a nice balance between the essential revenue needs of the Company and the value of the service to the rate payer and his ability to

pay. *Central Maine Power Co. v. Public Utilities Commission,* 150 Me. 257, 278, 109 A.2d 512, 522 (1954).

In two leading cases, the United States Supreme Court has sought to explain what are "just and reasonable" rates so as not to constitute confiscation. We quote from those cases, as we have done in the past:

What annual rate will constitute just compensation depends upon many circumstances and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally. *Bluefield Water Works & Improvement Company v. Public Service Commission,* 262 U.S. 679, 692–3, 43 S.Ct. 675, 679, 67 L.Ed. 1176 (1923);

The rate-making process under the Act, i. e., the fixing of "just and reasonable" rates, involves a balancing of the investor and the consumer interests. Thus we stated in the *Natural Gas Pipeline Co.* case that "regulation does not insure that the business shall produce net revenues." 315 U.S. p. 590, 62 S.Ct. 736. But such considerations aside, the investor interest has a legitimate concern with the finan-

cial integrity of the company whose rates are being regulated. *From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock.* Cf. *Chicago & Grand Trunk Ry. Co. v. Wellman,* 143 U.S. 339, 345–346, 12 S.Ct. 400, 36 L.Ed. 176. By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital. *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 603, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944) (emphasis supplied).

█ A variety of factors and methods may be considered by a regulatory agency in determining a fair rate of return. As the Supreme Court said in *Federal Power Commission v. Hope Natural Gas Co., supra:*

We held in *Federal Power Commission v. Natural Gas Pipeline Co., supra,* that the Commission was not bound to the use of any single formula or combination of formulae in determining rates. Its rate-making function, moreover, involves the making of "pragmatic adjustments." *Id.,* 315 U.S. p. 586, 62 S.Ct. 736. And when the Commission's order is challenged in the courts, the question is whether that order "viewed in its entirety" meets the requirements of the Act. *Id.,* p. 586, 62 S.Ct. 736. Under the statutory standard of "just and reasonable" it is the result reached not the method employed which is controlling. Cf. *Los Angeles Gas & Electric Corp. v. Railroad Commission,* 289 U.S. 287, 304–305, 314, 53 S.Ct. 637, 77 L.Ed. 1180; *West Ohio Gas Co. v. Public Utilities Commission* (No. 1), 294 U.S. 63, 70, 55 S.Ct. 316, 79 L.Ed. 761; *West v. Chesapeake & Potomac Tel. Co.,* 295 U.S. 662, 692–693, 55 S.Ct. 894, 79

L.Ed. 1640 (dissenting opinion). It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences. *Cf. Railroad Commission v. Cumberland Tel. & T. Co.,* 212 U.S. 414, 29 S.Ct. 357, 53 L.Ed. 577; *Lindheimer v. Illinois Bell Tel. Co., supra,* pp. 164, 169; *Railroad Commission v. Pacific Gas & Electric Co.,* 302 U.S. 388, 401, 58 S.Ct. 334, 82 L.Ed. 319. *Id.* at 602, 64 S.Ct. at 287.

 It is apparent then that our evaluation of the Commission's determination of rate of return must focus upon the reasonableness of the result reached. This Court must defer to the expertise of the Commission, its findings of fact being final if supported by substantial evidence in the record. *In re Powell,* Me., 358 A.2d 522, 528 (1976). We will not overturn the Commission's determination of a fair rate of return if the result is reasonable and the findings on which it is based are supported by substantial evidence. For this reason, our inquiry on this issue is twofold. First, did the Commission's calculations result in a fair rate of return? Second, were the Commission's findings of fact supported by substantial evidence.

An important method of determining a fair rate of return on investment is by analysis of the utility's cost of capital, *i. e.,* what it must pay to secure financing from equity (stock) and debt investors. Nichols, *supra,* ch. 10. Thus, the appropriate rate of return is based upon what the utility must earn to satisfy its investors. We recognized the importance of this factor in *Central Maine Power Co. v. Public Utilities Commission,* 156 Me. 295, 163 A.2d 762 (1960), in which we stated,

> Capital cost when competently computed is essentially and practically the equivalent of fair rate of return. *Id.* at 307, 163 A.2d at 769.

Accordingly, it appears to be the practice of the Commission, with the tacit approval of this Court, to calculate rate of return exclusively by means of the cost of capital method. *See Mechanic Falls Water Co. v. Public Utilities Commission, supra* at 1095.

The cost of capital is calculated by determining the cost of different items of capital. A weighted cost for each item is derived by multiplying its cost by its ratio to total capital. The sum of these weighted costs then becomes the rate of return.

A simplified example may be helpful at this point. Assume a utility with a capitalization of 25% debt and 75% common equity. Assume, also, that the cost of debt is simply the stated interest which the utility must pay on outstanding debt, say 8%. Because equity investors are subject to greater risks, the cost of common equity is higher, say 10%. Therefore, 25% of the utility's capital requires a return of 8%, thereby necessitating a return of 2.0% (25% × 8%) on the utility's total capitalization. In other words, a 2.0% return is required on 100% of the utility's capital in order to generate a return of 8% on 25% of its capital (2.0% × 100% = 8% × 25%). Similarly, equity has a weighted cost of 7.5% (75% × 10%). Totalling the weighted costs of the individual items of capital we find that the utility requires an overall rate of return of 9.5% in order to meet its cost requirements on the individual items in its capital structure. Such calculations are often expressed thusly:

| Item | Capital Structure | Cost | Weighted Cost |
|------|-------------------|------|---------------|
| Debt | 25% | 8% | 2.0% |
| Common Equity | 75% | 10% | 7.5% |

Rate of Return: 9.5%

*See, Mechanic Falls Water Co. v. Public Utilities Commission, supra* at 1095.

We now turn to three important factors in determining New England's cost of capital and rate of return.

### a. Cost of Debt

As we noted in *Mechanic Falls Water Co. v. Public Utilities Commission, supra,*

Ordinarily, the cost of debt is not a complex issue because it involves merely a mechanical computation of the interest rates on a utility's various debt investments. 381 A.2d at 1096.

In this case there appears to be no dispute as to the cost assigned by the Commission to New England's outstanding debt. Rather, the issue arises from the Commission's treatment of the amortization of the premium paid by New England to redeem certain debentures in 1977. New England maintains that the premium should be amortized over a period of 10 years, thereby resulting in a current annual cost of debt of 7.06%. However, the Commission found that the premium should be amortized over a period of 33 years, until the maturity date of the repurchased debentures, thereby resulting in a cost of debt of 6.99%.

We deny New England's appeal on this issue and sustain the Commission's finding of a cost of debt of 6.99%.

In February, 1977, New England repurchased, at a premium, $120,000,000 of 9.50% debentures which were not due and payable until 2010. The Commission allowed New England to consider the premium paid to repurchase the debentures as part of its cost of debt, to be recovered from the ratepayers as an expense.[22] New England proposed to amortize the premium over a 10-year period. However, the Commission found:

[T]he premium should be amortized over the full life of the debt [33 years], which means a lower annual amortization cost. On the basis of this adjustment, the embedded cost of debt drops to 6.99%. We will use 6.99% in calculating New England Telephone's fair rate of return. *Re New England Telephone and Telegraph Co.,* P.U.R. 4th (Me.Pub.Util.Comm.1977).

We affirm the Commission's use of the 33-year amortization of the premium in determining New England's cost of debt.

■■■■ As we stated in *Mechanic Falls Water Company v. Public Utilities Commission, supra,*

while a company's accounting methods may be considered by the Commission, they cannot dictate rate-making policies. 381 A.2d at 1102.

Moreover, the Legislature has granted the Commission authority over the utility's accounting methods. 35 M.R.S.A. §§ 53–60. The Commission may determine the proper amortization period for the repurchase premium if its finding is reasonable and supported by substantial evidence. We find that both standards are met here.

The debentures, which New England repurchased, were not due to mature until the year 2010. Thus, it was properly expected that New England's ratepayers would be financing the cost of such debt for an additional 33 years after the 1977 repurchase. New England now seeks to accelerate the payment period on the debentures to just the 10 years following 1977, thereby imposing the total cost of such debt onto New England's ratepayers during the next 10 years. The Commission could reasonably find upon the record that the cost of the debentures' premium should be allocated as an expense to be financed by the ratepayers over the next 33 years, as originally planned upon issuance of the debentures.

---

22. The Commission's brief notes:

[T]he Maine Commission treated the Company very favorably on this issue. It has been held that such costs of refunding bonds, i. e. call premiums, should properly be charged to the stockholders, and not to the ratepayers. *E. g. Chicopee Manufacturing Co. v. Public Service Company,* 98 N.H. 5, 93 A.2d 820, 98 P.U.R. (N.S.) 187, 193 (1953).

New England relies upon our decision in *Central Maine Power Co. v. Public Utilities Commission, supra* (1954), to support its argument that the Commission is bound by the 10-year amortization period selected by New England's management. In that case we considered the amortization of certain premiums paid by the utility pursuant to an insured pension plan for its officers and employees. In 1946, Central Maine Power Co. established the pension plan and was required to pay substantial premiums on the account of the *past* services of its then present employees, in addition to any current charges. The Company decided to amortize these payments over a 10-year period, but the Commission ordered that the payments be spread over a 30-year period for rate-making purposes. We sustained the Company's appeal on this issue and held that the Commission erred by arbitrarily disregarding the amortization period established by the Company's management. 150 Me. at 274–75, 109 A.2d at 520.

Our decision in *Central Maine Power Co.* does not control here and is clearly distinguishable. In that case the premiums amortized were incurred with respect to *past* services of present employees, and had minimal relation to the Company's ratepayers 30 years thence. We explained:

> It seems clear that the longer the past employment of an employee continued, the shorter will be the time during which he will serve before retirement and benefit the Company and its customers as a satisfied employee, *but* the greater will be his impact on the premium for past services. This suggests the fairness to future consumers in not extending the amortization period too far into the future. It is the consumer of the relatively near future who will benefit most from the expenditure of the past service premium. *Id.* at 274, 109 A.2d at 520.

The Company was also influenced by the fact that the Internal Revenue Code permitted the deduction of such premium payments over a minimum period of 10 years. Considerable reason existed to amortize the premium payments for past services over a reasonably short period, *i. e.* 10 years.

In this case New England has failed to demonstrate any reason why the debenture repurchase premium should be amortized over the abbreviated 10-year period instead of until the original 2010 maturity date. On the other hand, the Commission has reasonably argued that, unlike the 30-year period in *Central Maine Power Co.,* the 33-year period in this case is reasonably related to the period of time over which New England's ratepayers were initially expected to fund the cost of such debentures. New England has failed to meet its burden of overcoming the presumption favoring Commission decisions. Accordingly, we deny its appeal on this issue and affirm the Commission's finding that New England's cost of debt is 6.99%.

### b. Cost of Equity

In its calculation of New England's cost of capital and rate of return, the Commission assigned a cost of 11.5% to New England's common equity. The Commission's determination that New England's cost of equity was 11.5% comes against a background of considerable disagreement between the Staff's and New England's witnesses. New England argues that the 11.5% figure is unjust, unreasonable, confiscatory, and without sufficient foundation in the evidence before the Commission. To the contrary, we find that the Commission's determination is reasonable in result and methodology and supported by substantial evidence. Accordingly, we sustain the Commission's finding that New England's cost of common equity is 11.5% and deny New England's objections on this issue.

> This Court has ruled that a public utility is entitled to a fair return, and less than a fair return would be confiscatory. *Central Maine Power Co. v. Public Utilities Commission, supra,* 153 Me. at 250, 136 A.2d at 739 (1957).

In determining what constitutes a fair rate of return to the utility and its investors, we are guided by the principles announced by the United States Supreme Court in *Bluefield Water Works & Improvement Co. v.*

*Public Service Commission, supra,* and *Federal Power Commission v. Hope Natural Gas Co., supra.* First, the return must be commensurate with returns on investments in other business enterprises having corresponding risks and uncertainties. Second, the return must be sufficient to assure confidence in the financial integrity of the business enterprise so as to maintain its credit and enable it to attract capital. The Commission's decision adequately takes into account both of these basic principles.

As we have indicated, the Commission was faced with a considerable amount of testimony with respect to the cost of equity issue. The Commission's staff presented one witness on the issue and New England countered with three witnesses, all four advocating different methods with differing results. In *Central Maine Power Co. v. Public Utilities Commission, supra,* (1957), we stated

It will serve no useful purpose in our view to review the mass of testimony from financial experts on the rate of return necessary to support the enterprise and attract new capital. There is no warranty of certainty in matters of this nature. 153 Me. at 251, 136 A.2d at 740.

We lack the technical expertise vested in the Commission concerning such matters. However, a brief summary of the suggested approaches, and the Commission's disposition thereof, is appropriate in this case.

New England's principal witness on the cost of equity issue, Mr. John H. Cogswell, relied upon five different approaches to support his recommendation of 14%–15.5%:

(1) His first approach was the "comparable earnings" approach, which we discussed in some detail in *Mechanic Falls Water Co. v. Public Utilities Commission, supra.* The Commission rejected his application of the approach in this case because the companies on which he had relied had market-to-book ratios (see discussion *infra*) significantly greater than that found appropriate for New England.

(2) His second approach was the "investor expectation" approach, which appears to resemble the discounted cash flow (DCF) method advocated by Staff witness Kosh and ultimately adopted by the Commission. He combined New England's current dividend yield of 8% with an expected growth rate of 4%–4.3% to arrive at an investor's required return of 12%–12.3%. This figure was then increased to 14.4%–16.3% to reflect Mr. Cogswell's objective market-to-book ratio of 1.3 to 1.5. The Commission rejected this approach because it found both his growth rate and market-to-book ratio to be unacceptably high.

(3) His "return spreads" approach was based on the theory that equity costs must move in line with debt costs. Since the 1960–65 period, New England's debt cost had increased by 4%–5.5%. This figure was then added to New England's 1960–65 return on equity of 9.5% to arrive at a current cost of equity of 13.5%–15%. The Commission rejected this approach because during the 1960–65 base period New England's market-to-book ratio was 1.8 and

maintenance of that relationship today would produce a similar and unduly high market-to-book ratio. *Re New England Telephone and Telegraph Co., supra,* —— P.U.R. 4th at ——.

(4) His fourth approach was the "entity premium" method, which considered the amount by which the expected return to the equity investor exceeds the expected return to the debt investor. Mr. Cogswell calculated that an equity premium of 4.9%–6.2% was required to produce a market-to-book ratio of 1.3 to 1.5. He combined these equity premium figures with what he considered to be New England's current 9% cost of debt to arrive at a cost of equity of 13.9%–15.2%. The Commission also rejected this approach because it was based upon a market-to-book ratio which it considered to be unacceptably high. In addition, the Commission appeared dubious of the equity premium figures he selected.

(5) His final approach was claimed to be based upon the "financial integrity" criterion of *Federal Power Commission v. Hope Natural Gas Co., supra,* which approach determined the return on equity that would exist if earnings per share had kept step

with inflation since 1966, resulting in a cost of equity of 14.7%–16%. The Commission rejected this approach because of its "mechanical" selection of 1966 as the base year, noting that the selection of a base year of 25 years prior would result in a significantly lower figure. In addition, the Commission found

> this method results in a market-to-book ratio clearly in excess of that which we find reasonable. *Re New England Telephone and Telegraph Co., supra,* —— P.U.R. 4th at ——.

The second New England witness on cost of equity, Doctor Robert S. Stich, used the "opportunity cost of equity capital" method to arrive at a cost of 15%. He determined the opportunity cost by measuring what the investor's equity could earn in alternative investment opportunities of corresponding risk. The Commission viewed his approach as essentially a comparable earnings approach and rejected it because

> Doctor Stich made no comparisons of the risks of these groups to the risk of New England. *Id.* at ——.

In addition, the market-to-book ratios of the other companies were significantly higher than that found proper for New England.

New England's third witness on cost of equity was Mr. Robert E. LaBlanc, an expert in the investment field, who testified from his observations of the investment marketplace that a return of 14.7%–15.7% was required to restore investor confidence in New England. The Commission found that his testimony lacked evidentiary support and rejected his conclusions, stating,

> expert witnesses should present the factual and analytical basis for their opinions. *Id.* at ——.

 Thus, the Commission considered and rejected the testimony of New England's witnesses on cost of equity. Its decree contains a brief summary of the testimony and suggestions of each witness and a statement of the Commission's reasons for rejecting each approach. New England suggests that the Commission has arbitrarily disregarded this "overwhelming"

evidence that the cost of equity was in the range of 14%–15.7%. We hold that the Commission's treatment of New England's cost of equity testimony was both reasonable and sufficient. It is the function of the Commission to hear the testimony, weigh the evidence, and to reach reasoned conclusions of fact. As the trier of fact, there is no reason in law why the Commission could not reject the evidence of certain witnesses and accept the views of another. *Central Maine Power Co. v. Public Utilities Commission, supra* (1957). Our review of the Commission's findings of fact is limited to only a determination whether they are supported by substantial evidence. If so, there is no legal error and such findings are final. *In re Powell, supra* at 528.

In a proper exercise of its discretion, the Commission relied upon the testimony of staff witness Mr. David A. Kosh, in determining New England's cost of equity. Mr. Kosh's testimony used the "discounted cash flow" (DCF) method to calculate New England's cost of equity. The DCF method involves the combination of anticipated dividends and expected future growth in the value of the equity investor's investment to find a "bare cost of equity." Mr. Kosh analyzed the dividend yield and growth rate of New England, American Telephone & Telegraph, and three other Bell subsidiary operating companies which had a portion of their stock traded in the public market (i. e. "minority" companies). Thus, he gave consideration to the return on equity of other companies with comparable risks.

Mr. Kosh determined that the bare cost of equity was 10.25% for New England (8.75% yield and 1.5% growth rate), 10.44% for American Telephone & Telegraph (6.69% dividend yield and 3.75% growth rate), and 11.05% for the three other Bell operating companies (8.10% dividend yield and 2.95% growth rate). Based on this data he concluded that the bare cost of equity for New England was 10.5%.

However, all parties are agreed that bare cost of equity is not an adequate determination of a utility's cost of equity. Proper consideration must be given to the "market-to-book ratio" of the utility's common stock.

Because the bare cost of equity is calculated upon the utility's book value, Mr. Kosh testified that if New England were to earn just 10.5%, the market price of its common equity would tend to equal its book value. However, in order for a utility to be able to sell new issues of common stock, the market value of its stock must exceed its book value. Otherwise, the utility would receive from its new investors less than the book value of its present stock, which has the effect of reducing the overall average value of each share of stock. This results in what is called "dilution" of the investment of the existing stockholders. The return on common equity must be sufficiently high so as to drive up the market value of the common stock in order to insure that no stock need be issued at less than book value.

The market-to-book ratio is used as a measure of how much greater the market value of the stock must be over its book value so as to prevent dilution. New England's witness testified that it needs a market-to-book ratio of 1.3 to 1.5. On the other hand, Mr. Kosh testified that a market-to-book ratio of 1.1 to 1.15 was sufficient. Based upon his bare cost of equity of 10.5%, he stated that a 11.25% return on the book value of common equity was required to meet this objective market-to-book ratio, and therefore, concluded that New England's cost of equity was 11.25%.

The Commission substantially followed Mr. Kosh's recommendations concerning cost of equity, which supplied substantial evidence to support its findings of a cost of equity of 11.5%. The Commission stated that it determined a slightly higher cost of equity than that recommended by Mr. Kosh for a number of reasons. It deemed it proper to give slightly more weight to the higher bare cost of equity of the three other Bell operating companies. In addition, the Commission reasoned that because in 1976, New England earned 11.1% on its average book equity and its market price was about 5% above book value, its bare cost of equity was closer to 10.75% than the 10.5% recommended by Mr. Kosh. Therefore, the Commission concluded,

the appropriate cost of equity to use at this time in the determination of the fair rate of return applicable to the Maine intrastate operations of New England Telephone is 11.5%. *Re New England Telephone and Telegraph Co., supra,* —— P.U.R. 4th at ——.

New England's principal objection to the Commission's calculation of the 11.5% cost of equity appears to concern its use of a market-to-book ratio of 1.1 to 1.15. New England argues that this figure is unreasonably low and results in dilution of the stockholders' interest and, consequently, confiscation. We find no error in the Commission's selection of a market-to-book ratio of 1.1 to 1.15 and hold that its determination was reasonable and supported by substantial evidence.

Mr. Kosh testified that the cost of financing and pressure would act to reduce the proceeds of a stock issue by approximately 5%. Cost of financing includes legal and brokerage fees, accounting expenses, taxes, etc. Pressure describes the tendency of a stock's market price to drop when new stock is issued by the same corporation. Mr. Kosh presented sufficient and detailed testimony to support a finding that a market price of 5% over book value was required to compensate for these effects. Also based upon his studies, Mr. Kosh added another 5% as a margin of protection against short-term declines in the market price of New England's stock. He then concluded that the market price of New England's stock must be 10%–15% above its book value in order to prevent dilution. This produces the 1.1 to 1.15 market-to-book ratio used by the Commission in its determination of a cost of equity of 11.5%.

We sustain the Commission's finding in this respect. Our analysis of the record on this issue has demonstrated that the determination of the cost of equity is one of the most difficult and complex tasks facing the Commission. The Commission must utilize to the fullest its regulatory expertise and skill to analyze the highly technical economic and financial data presented on this issue. We cannot and will

not attempt to second guess the Commission on such matters lying particularly within its area of expertise. Only when its actions are unreasonable or unsupported by substantial evidence may we intervene. *New England Telephone and Telegraph Co. v. Public Utilities Commission,* 148 Me. 374, 377, 94 A.2d 801, 803 (1953). Moreover, the burden of proof rests upon New England to demonstrate that the Commission has committed legal error. 35 M.R.S.A. § 307; *Central Maine Power Co. v. Public Utilities Commission, supra,* 156 Me. at 299, 163 A.2d at 765 (1960).

We hold that New England has failed to meet its burden on this issue. Our review of the record with proper deference being given to the Commission, convinces us that its determination of a 11.5% cost of equity was reasonable in result and supported by substantial evidence in the record.[23]

New England also objects to the Commission's determination of an 11.5% cost of equity on a number of other grounds. Because we find the Commission's finding reasonable and supported by substantial evidence, we will not discuss those grounds in great detail.

New England argues that the Commission failed to give adequate consideration to its recent financial history, which, it claims, demonstrates the Company's need for a substantially higher return on equity in order to attract capital from investors. Our review of the record shows that Mr. Kosh's testimony incorporated aspects of New England's financial history into the data presented. But, more importantly, ratemaking is a *prospective* function; and, while the utility's financial history is relevant evidence, it does not govern the Commission's determination of what constitutes a fair rate of return. *See New England Telephone and Telegraph Co. v. Public Utilities Commission,* Me., 354 A.2d 753, 768–70 (1976); *Central Maine Power Co. v. Public Utilities Commission, supra* (1960); *Central*

*Maine Power Co. v. Public Utilities Commission, supra* (1957).

New England places strong reliance upon the fact that the highest court of our sister state of Massachusetts has found that the minimum level of confiscation for New England is at a 13% return on equity. *New England Telephone and Telegraph Co. v. Department of Public Utilities,* 1976 Mass.Adv.Shts. 2246, 354 N.E.2d 860, 868 (1976). New England also refers to New Hampshire and Vermont commission cases which have allowed it a 12.65% and 12.5% return on equity capital, respectively. *Re New England Telephone and Telegraph Co.,* 13 P.U.R. 4th 268, 274 (Vt.Pub.Serv.Bd. 1976); *Re New England Telephone and Telegraph Co.,* 14 P.U.R. 4th 295, 303 (N.H. Pub.Util.Comm.1976). These cases do not control. The Maine Public Utilities Commission must make its own independent determination as to New England's fair rate of return with respect to the Maine intrastate operations. Upon review, we judge the Commission's actions by the standard of review we elaborate and apply in this case. If the Commission's actions satisfy our standard of review, we affirm. The Commission and this Court cannot abdicate their responsibilities by relying upon decisions made in other jurisdictions where the ratemaking approaches and standards of review might differ. To further demonstrate the impropriety of relying upon the decisions in other jurisdictions concerning such complex matters, we note that the Commission has been able to cite to us an even larger number of decisions in which the return on equity allowed to a Bell operating company was less than 11.5%.

Finally, New England attacks the Commission's determination of an 11.5% return on equity because it allegedly failed to demonstrate sufficient expertise, to make an adequate analysis, and to make specific findings. We disagree. We have concluded, with respect to the cost of equity issue,

**23.** We reach the same conclusion for similar reasons with respect to the 1.5% growth rate for New England used by Mr. Kosh in his DCF analysis, which New England challenges in its reply brief.

that the Commission's determination was reasonable in result and supported by substantial evidence in the record to which it gave adequate consideration. Therefore, we sustain the Commission's finding that the cost of New England's common equity is 11.5%.

### c. Capital Structure—the Commission's "Double Leveraging" Adjustment

It can be seen that the cost of capital depends not only upon the individual cost of the different items making up a utility's capitalization, but also upon the proportion of those individual items to the total capital structure. If the earlier example of a hypothetical utility were capitalized at 50% debt and 50% equity, the capital cost calculations would be as follows:

| Item | Capital Structure | Cost | Weighted Cost |
|---|---|---|---|
| Debt | 50% | 8% | 4.0% |
| Equity | 50% | 10% | 5.0% |
| | | Rate of Return: | 9.0% |

An increase in the "debt ratio" to 50% reduces the hypothetical utility's cost of capital, and rate of return, to 9.0%. This is because of the simple economic fact that debt financing costs less than equity financing. Although a 0.5% reduction in the rate of return may, at first glance, appear somewhat insignificant, it becomes most significant when a utility has a multi-million dollar rate base, as does New England. It is well-recognized that

> The capital structure of a corporation has a direct influence on the cost of capital. Nichols, *supra* at 263. See also 1 A. Priest, *Principles of Public Utility Regulation* 210–15 (1969).

A higher "debt ratio" means lower rate of return and lower rates to the utility's customers.

It appears to be common regulatory practice to disregard the actual book capital structure of a utility when it is deemed to be in the public interest to do so. Instead, a utility commission will adopt a hypothetical capital structure for ratemaking purposes. Nichols, *supra* at ch. 14, § 2; Priest, *supra* at 210–15.

There are two well-recognized circumstances in which a utility commission might disregard a utility's "actual" capital structure and adopt a "hypothetical" capital structure for ratemaking purposes. This first occurs when the utility's actual debt-equity ratio may be deemed to be inefficient and unreasonable, because it contains too much equity and not enough debt, thereby necessitating an inflated rate of return. (On the other hand, the proportion of debt cannot be too high so as to discourage further investment by debt investors.) In such cases the utility commission might adopt a hypothetical ideal capital structure for ratemaking purposes. The result is that rates are determined on the basis of a more reasonable and less expensive capital structure. Moreover, the adoption of a hypothetical structure will coerce management to move toward the ideal capital structure in the future because the utility can no longer collect the higher rate of return necessitated by its present capital structure.

The second circumstance occurs when the utility is part of a holding company system. In such cases the utility's book capital structure and capital costs may not be a true reflection of the *system's* capital costs with respect to a particular operating company. It is well-settled that

> the underlying capital structure of the system must be considered in any parent-subsidiary situation. *Priest, supra* at 214; *Potomac Edison Company v. Public Service Commission*, 279 Md. 573, 369 A.2d 1035, 1040 (1977).

The double leveraging formula adopted by the Commission represents one of a number of different approaches which have been utilized by regulatory agencies to account for a utility's status as a subsidiary in a holding company system.

New England is part of the Bell Telephone System, whose parent company is American Telephone and Telegraph Company (AT&T). AT&T owns 86% of New England's common stock, and approximately 45,000 members of the general investing public own the remaining 14%. AT&T also owns 100% of the capital stock of 17 other

operating telephone companies throughout the United States. In addition to New England, AT&T owns over 86% of three non-wholly owned telephone operating companies, and has a minority interest in two other telephone operating companies. In addition, AT&T owns all of the stock in Western Electric Company, its manufacturing arm. AT&T and Western Electric each own 50% of the stock of Bell Telephone Laboratories, Inc., which conducts research, development and design. Together with their own subsidiaries and a few other minor subsidiaries of AT&T, these companies comprise the Bell System. The double leveraging adjustment was an attempt by the Commission to account for New England's status as a subsidiary in the Bell system for purposes of determining cost of capital.

The parties appear agreed, for purposes of this appeal, that New England's book capital structure consists of 45% debt and 55% common equity. Staff witness Mr. David A. Kosh recommended the use of the capital structure of the consolidated Bell System, which he set at the optimum hypothetical ratio of 51% debt, 4% preferred stock, and 45% common equity, to determine New England's cost of capital. (If the Commission chose to base the rate of return upon New England's capital structure alone, he suggested a hypothetical capital structure for New England of 55% debt and 45% equity.) His testimony focused upon the appropriateness of using the capital structure and costs of the consolidated Bell System to determine New England's fair rate of return. Because New England is an integral member of the Bell System, he reasoned that the System's capital structure influenced investment in New England. Therefore, New England's cost of capital was actually the cost of capital to the consolidated Bell System. In fact, New England's witness Mr. John H. Cogswell agreed that the consolidated system approach might be appropriate if New England were a wholly-owned subsidiary of AT&T. However, Mr. Kosh admitted that, where a substantial minority ownership exists, the consolidated system approach has the effect of lowering the average return allocated to the minority shareholders below the 11.25% he recommended for equity.

The Commission declined to follow Mr. Kosh's recommendation of the consolidated capital structure approach for the very reason that it assumed New England was a wholly-owned subsidiary of AT&T and gave no consideration to the existence of the 14% minority. Rather, the Commission chose to apply the "double leveraging" formula, which had been suggested as an alternative method by Mr. Kosh. The Commission believed that the method by which it applied the double leveraging formula in this case gave adequate consideration to the 14% minority.

"Leveraging" is a financial term used to describe the situation in which a corporation is funded by debt in addition to the equity supplied by stockholders. A corporation is said to be "leveraged" to the extent that debt is included in its capital structure. According to the Supreme Court,

> "Leverage" is the term used to describe the advantage gained by junior interests [equity] through the rental of capital [debt] at a rate lower than the rate of return which they receive in the use of that borrowed capital. *Securities and Exchange Commission v. Central-Illinois Securities Corp.*, 338 U.S. 96, 150, n. 49, 69 S.Ct. 1377, 1405, 93 L.Ed. 1836 (1949).

By leveraging their investment with debt, stockholders may effectively "own" a corporation which is worth much more than their original investment.

The use of leverage may have considerable effect on utility rates:

> Leverage, basically, is the use of debt capital to earn an overall rate of return in excess of the cost of such capital. These additional earnings over cost inure to the benefit of the stockholders who are thus "levered" above what they might otherwise receive in the absence of debt financing. Brown, *Double Leverage: Indisputable Fact or Precarious Theory?*, 93 Pub.Util.Fort. 26, 26 (May 9, 1974).

Utility commissions appear to prevent such "additional earnings" by analyzing a utility's capital structure and allocating a different weighted cost to each of the individual elements of the capital structure, including debt. Thus, the utility's owners are allowed to earn on debt only what it cost them to secure the leverage.

Mr. Brown goes on to explain the concept of "double leveraging":

Double leverage is merely an extension of the concept of leverage to a parent-subsidiary corporate relationship. Company A, for example, is an operating utility, financed partly with debt capital and partly with equity capital. It uses leverage as explained earlier. The difference is that the common stock of Company A is owned by Company B, the parent company. Where did Company B obtain the funds it invested in the common stock of Company A?

The answer to the above question is that Company B raised its own capital partly through the sale of stock and partly from a debt issue; that is Company B is also levered. Thus Company A enjoys its own leverage factor—the use of debt instead of all equity capital—plus the leverage factor of its parent company which also uses some debt instead of all

equity capital. This is the essence of the meaning of "double leverage." *Id.* at 27. Thus, double leverage

exists when a holding company employs leverage to purchase the equity of a subsidiary. Copeland, *Double Leverage One More Time,* 100 Pub.Util.Fort. 19, 20 (August 18, 1977).[24]

The principle behind the application of double leveraging adjustments by utility commissions is to account for the parent's alleged use of its low cost debt to purchase stock in its subsidiary, upon which it may earn a higher rate of return than it pays for the debt.[25] The Iowa State Commerce Commission has justified its use of double leveraging thusly:

Under our system of regulation a company is allowed to earn on the shareholders' equity investment in utility plant a return equal to what it currently costs the company to attract that equity in the stock markets. Where a company's equity is held directly by shareholders this is accomplished by allowing a company a return on its equity investment in utility plant equal to the market cost of equity.

However, when there is a parent-subsidiary relationship, where there is debt issued by both parent and subsidiary, there exists a form of financial pyramiding known as "double leverage." If we

**24.** The Commission explains double leveraging as follows:

Like many businesses, utilities usually have a capital structure that is "leveraged"; that is, one that will allow equity owners to own a company while not furnishing its entire capital. Thus, equity holders may put up only 35 percent of the total investment, with debt or preferred stockholders putting up the remaining 65 percent. Regulation has consistently held that the lower costs of a leveraged capital structure, one containing less than 100 per cent equity, should be reflected in the rates.

Holding companies, by their very nature, are able to "double leverage" the investment in their subsidiaries. Thus a subsidiary of a holding company has its own capital structure because it contains debt. That is leverage number one. Its parent owns most or all of the subsidiary's equity. Because the parent can issue debt, it can have its own leveraged capital structure. That is leverage number two. Thus the parent, such as

American Telephone and Telegraph Company, can use its debt and equity to buy the equity of the subsidiary. To the extent that equity of the subsidiary is purchased with the parent's debt capital, the subsidiary's capital structure is said to be "double leveraged." Were the parent company not to have any debt, there would only be single leverage. *Re New England Telephone and Telegraph Company,* 13 P.U.R. 4th 65, 70 (Me.Pub.Util. Comm.1976).

**25.** Basing the allowed rate of return on the consolidated cost of capital and capital structure is considered to be an alternative method of accounting for double leverage which "has been traditionally applied in cases involving Bell system subsidiaries and consequently double leverage has never been the issue for the Bell system that it is for independent telephone holding company systems." Copeland, *supra,* at 21. *See Re Northwestern Bell Telephone Company,* 97 P.U.R. 3d 444, 463 (Iowa State Commerce Comm.1972).

were to ignore this double leverage and allow the subsidiary a return on its "apparent" equity investment in utility plant equal to the market cost of equity, this could result in the parent's shareholders earning more on their investment in the company than the market cost of equity. Permitting this to occur not only results in greater earnings to the actual equity holder than is proper, but also discriminates against those companies who do not engage in double leveraging, and whose shareholders are restricted to earnings on their investments in the company equal to the market cost of equity. *Re Hawkeye State Telephone Company*, 2 P.U.R. 4th 166, 180–81 (Iowa State Commerce Comm.1973).

Unlike any other case in which double leveraging or the consolidated system approach have been applied,[26] the New England Telephone Company is not a wholly owned subsidiary of AT&T. However, the Commission considered AT&T's 86% ownership of New England to be sufficient to justify double leveraging. Because AT&T financed its purchase of New England stock with funds it received from its own investors, the Commission reasoned that AT&T's return on its investment in New England should reflect AT&T's cost for such funds.

The Commission found that AT&T's own capital structure consists of 25% debt, 9% preferred stock, and 66% common equity, based upon the testimony of Mr. Kosh. For the costs of these individual items it used 6.5% for debt, 7.8% for preferred stock, and 11.5% for common equity.[27] The Commission then calculated AT&T's cost of capital as follows:

| Item | Capital Structure | Cost | Weighted Cost |
|------|-------------------|------|---------------|
| Debt | 25% | 6.5% | 1.63% |
| Preferred Stock | 9% | 7.8% | .70% |
| Common Equity | 66% | 11.5% | 7.59% |
| | | Cost of Capital: | 9.92% |

Thus, the Commission found that AT&T was entitled to a 9.92% return on its investment in New England, this being the Bell system's actual cost for the 86% of New England's equity owned by AT&T. On the other hand, the 14% minority was to be allocated a 11.5% return upon its investment in New England, as the market cost for New England's common equity held by outside investors. The Commission inserted these figures into New England's actual capital structure of 45% debt (which was found to have a cost of 6.99%) and 55% equity (which was proportionally divided

26. The recent decision of the Rhode Island Supreme Court in *Bristol County Water Co. v. Harsch*, 386 A.2d 1103 (R.I.1978), upholding the Rhode Island Public Utility Commission's use of the "double leveraging" theory to determine the water company's rate of return, does not involve the kind of minority interests now before us. In that case the parent company owned 86.8% of the common stock of the water company, and the Town of Bristol owned the remaining 13.2%. The Rhode Island Commission was not presented with the situation, as here, where many members of the general investing public own a substantial minority interest in the utility. The water company was essentially a closely held corporation, unlike New England whose stock is actively traded in the market. Thus, the Rhode Island case does not raise the issues presented here concerning a bona fide minority interest.

The decision of the Rhode Island Commission, rejecting the application of a double leveraging adjustment to New England, *Re New England Telephone and Telegraph Co.*, Docket No. 1251 (R.I.Pub.Util.Comm. September 4, 1977), demonstrates recognition of this distinction. In addition, the Rhode Island Supreme Court's opinion in *Bristol* includes no discussion of the minority interest issue. The Court merely holds that the water company failed to present clear and convincing evidence that the rate of return was clearly, palpably, and grossly unreasonable. Therefore, in this opinion, the Bristol decision is *not* regarded by us as a case in which a double leveraging adjustment was applied to a subsidiary that was not wholly owned.

27. As we will explain below, its selection of these costs is a source of error in this case.

between AT&T's and the 14% minority's ownership) as follows:

| Item | Capital Structure | Cost | Weighted Cost |
|---|---|---|---|
| Debt | 45% | 6.99% | 3.15% |
| Common Equity AT&T Supplied (55% x 86%) | 47.3% | 9.92% | 4.69% |
| Minority supplied (55% x 14%) | 7.7% | 11.5% | .89% |
| | | Rate of Return: | 8.73% |

Accordingly, the Commission found that New England was entitled to a fair rate of return of 8.73%, when proper consideration was given to its double leveraged capital structure.[28]

The Commission claims that the effect of its decree is to allow a reasonable return of 9.92% to the 86% of New England common equity owned by its parent AT&T and a reasonable return of 11.5% to the 14% of New England owned by some 45,000 members of the investing public. However, the effect of the decree is to allow an average rate of return to all of New England's common equity of 10.14% ([86% × 9.92] + [14 × 11.5%] = 10.1412%). Thus, the overall effect of the Commission's decree is to allow AT&T a higher rate of return than the 9.92% deemed to be the proper cost of 86% of New England's common equity, which would appear on its face, to be unfair to the ratepayers. On the other hand, the average return of 10.14% is below the 11.5% found to be reasonable for the 45,000 members of the investing public making up the 14% minority, which New England claims constitutes confiscation.

We need not reach these questions at this time because we find that the Commission has not given the adequate consideration of the minority issue necessary for us to determine the reasonableness of the result. Moreover, we find that its method of applying double leveraging in this case is not supported by substantial evidence in the record and appears inconsistent with the

Commission's own declarations concerning the theory. Therefore, we cannot approve the Commission's use of a double leveraging adjustment upon the facts of this case.

Although the staff's principal witness on this issue, Mr. Kosh, recommended the consolidated system approach to determine cost of capital, his testimony did provide a sufficient basis upon which the Commission could derive a double leveraging adjustment. He stated that a double leveraging adjustment was an alternative to the consolidated system approach, and provided an illustrative calculation of a double leveraging adjustment for New England. Moreover, the Commission's questioning of Mr. Kosh demonstrates a sufficient understanding of double leveraging in general. We must defer to the expertise of the Commission on such matters and uphold their methodology if supported by substantial evidence.

While the record might contain substantial evidence to support the application of a double leveraging adjustment in general, it lacks the sufficient evidence and findings of fact to support double leveraging *in this case*. One deficiency in the record concerns AT&T's own cost for the items of its capital structure which were imputed onto 86% of New England's equity. In its double leveraging calculation the Commission used a cost for AT&T debt of 6.5%, a cost for AT&T preferred stock of 7.8%, and a cost of AT&T's common equity of 11.5%. However, its decree contains no finding that the percentage figures are in fact AT&T's cost of capital and insufficient evidence in the record supports these figures.

Although the burden of the proving error is upon the appellant utility, *Central Maine Power Co. v. Public Utilities Commission, supra* (1960), the Commission's findings of fact are not final unless supported by substantial evidence in the rec-

28. The Commission's calculations may be broken down to reveal the individual effects of the different elements of AT&T's capital structure as follows:

| Item | Capital Structure | Cost | Weighted Cost |
|---|---|---|---|
| Debt | 45% | 6.99% | 3.14% |
| Common Equity | | | |
| AT&T Debt | 11.8% | 6.5% | .77% |
| AT&T Preferred | 4.3% | 7.8% | .34% |
| AT&T Equity | 31.2% | 11.5% | 3.59% |
| Minority Equity | 7.7% | 11.5% | .89% |
| | | Rate of Return: | 8.73% |

ord, *Application of Casco Castle Co.*, 141 Me. 222, 42 A.2d 43 (1945). Moreover, this Court has stressed the importance of factual findings by the Commission.

The facts on which the rulings of the Commission are based must either be agreed to by the parties or found by the Commission. . . . [I]t is clearly the duty of the Commission under the statute, at least, if requested by any of the interested parties, to set forth in its orders and decrees the facts on which its order is based, otherwise the remedy provided by the statute for any erroneous rulings of law may be rendered futile. *Hamilton v. Caribou Water, Light & Power Co.*, 121 Me. 422, 424–25, 117 A. 582, 583 (1922).

Therefore, the Commission's double leveraging adjustment must be supported by findings of fact which are supported by substantial evidence.

As we stated, the Commission's decree fails to make findings of fact concerning the costs for the elements of AT&T's capital structure. The Commission did make a sufficient finding that New England's cost of debt is 6.99%, but it makes no corresponding finding that AT&T's cost of debt is the 6.5% it used in its calculations.

Similarly, the Commission makes no finding that AT&T's costs for preferred stock is 7.8%. Moreover, this figure is not supported by the record. Although Mr. Kosh's testimony does compute the *Bell System's* cost for preferred to be 7.79%, his background figures show that AT&T's preferred stock alone has a cost of 8.07%. Our understanding of the double leveraging theory, from our readings and the Commission's explanation in its decree, is that the parent's cost of capital is to be substituted for the equity of its subsidiary in the subsidiary's capital structure. The purpose of the adjustment is to use the *parent's* cost of capital in determining the fair rate of return for the common equity held by the parent. Thus, the Commission states that the cost of 86% of New England's common equity must be "determined with reference to the capitalization and cost rates *of the parent*, AT&T." Yet the Commission ap-

parently used the *consolidated system's* cost of preferred stock for AT&T's cost of preferred. We cannot accept this inconsistency in reasoning and confusion of the consolidated system and double leveraging approaches in this case. There are no findings of fact and no supporting evidence for the result.

A similar error appears with respect to the cost of AT&T's equity. Not only did the Commission fail to make a separate finding as to AT&T's cost for common equity, but also it used the 11.5% figure which it had found to be *New England's* cost of common equity.

We cannot affirm the Commission's application of the double leveraging adjustment in this case where such basic findings of fact and supporting evidence are lacking. It is not proper to rule upon the reasonableness of double leveraging when such basic factors are absent. We strongly recommend that, in the future, the Commission's decrees and supporting records be more fully developed when it adopts such novel approaches to ratemaking. Moreover, we have a more compelling reason to reject the Commission's use of double leveraging in this case.

The most serious error with respect to the double leverage adjustment, and our principal reason for refusing to sustain the Commission on this issue, concerns existence of the 14% minority. The record shows that this issue is what most troubled New England's witnesses and the Commissioners with respect to double leveraging. Yet the Commission's decree gives this crucial issue little of the attention it warrants.

The parties' briefs and our research fail to disclose any cases, in which a double leveraging adjustment or consolidated system approach was approved, where the utility was not a wholly-owned subsidiary. Thus, the Commission's approach appears to be without direct precedent. In every case where a Commission attempted to account for a double leveraged capital structure, the only stockholder whose return on common equity was affected was the utility's own parent company. However, in this case there are approximately 45,000 members of

the investing public who own 14% of the common stock of New England. The Commission determined that the reasonable rate of return on their investment was 11.5%. Yet, as we have noted, the effect of the Commission's double leveraging adjustment is to lower the overall return on all shares of New England's common equity to 10.14%. We are unable to find this result reasonable upon the record before us.

What little legal writing exists on the issue suggests that the existence of the 14% minority presents a substantial problem in this case. In the first place, most articles, court and Commission decisions imply that double leveraging is appropriate only when the utility is a wholly-owned subsidiary. Thus, the Commission in *United Telephone Company of Iowa v. Iowa State Commerce Commission*, 257 N.W.2d 466 (Iowa 1977), *aff'g Re United Telephone Company*, 94 P.U.R. 3d 437 (Iowa State Commerce Comm.1972), had agreed that the Telephone Company's actual capital structure would be appropriate

> if the Company were not a wholly owned subsidiary of a holding company. *Id.* at 480.

Moreover, in some cases we find more direct indications that double leveraging or the consolidated system approaches are inappropriate where a substantial minority exists. New England cites to us *Re New England Tel. & Tel. Co.*, Docket No. 1251 (R.I.Pub.Util.Comm. September 4, 1977), from which it quotes:

> The Commission is unable to accept Dr. Wilson's proposed use of the double leverage concept as it applies to New England. The record evidence shows that 85.95% of New England is common equity owned by American Telephone and Telegraph Company and 13.05% [sic] by public shareholders, or an average of 165 shares each. (See NET Annual Report to RIPUC dated December 31, 1976). The Commission is persuaded that *the minority ownership of New England is genuinely "public".* It is not institutional nor is it controlled by officials of New England or AT&T. *Under these circumstances, we are not prepared to adopt the double leverage approach* on the facts of the case before us. *If* the Company were a *wholly owned subsidiary* of a holding company system, or if the minority ownership were centered in institutional investors or officials of the Company, this Commission could be persuaded to adopt the double leverage. It declines to do so, however, on the present record. (Emphasis supplied)

Our research discloses one other recent regulatory decision which indicates a reluctance to impute double leveraging where a substantial minority interest exists. In *Re Mountain States Telephone & Telegraph Company*, 9 P.U.R. 4th 518 (Wyo.Pub.Serv. Comm.1975), the Wyoming commission found that AT&T owned 88.6% of the outstanding common stock of the operating company. The other 11.4% was held by approximately 26,000 shareholders. The Commission's decision contains the following isolated reference to double leveraging:

> Staff witness LaConto's main evidence is:
>
> (1) Applying a "double leveraging" approach using a parent company's debt/equity ratio in place of a subsidiary's equity portion of its capitalization demonstrates that AT&T's actual "leveraged" equity rate of return is notably higher than that of Mountain Bell; but because this approach if used would in that proportion lower Mountain Bell's minority stockholders' equity return it is not requested to be applied. *Id.* at 527–28.

The interests of minority shareholders were also found to be of importance in setting rates in *Re Mountain States Telephone & Telegraph Company*, 7 P.U.R. 3d 115, 120–121 (Ariz.Corp.Comm.1954) (13.3% minority); and *Re Coos Telephone Company*, 1918 F P.U.R. 592, 600–1 (N.H.Pub.Serv. Comm.1918) (2% minority). Also, one commentator has noted that

> Neither the consolidated capital structure nor the double leverage approach is appropriate when a substantial minority interest exists . . . . Foster, *Fair Return Criteria and Estimation*, 28 Baylor Law Rev. 883, 889 (1976).

(Unfortunately, Mr. Foster cites no authority, fails to define "substantial minority interest", and does not explain why the existence of such a minority precludes double leveraging.)

On the other hand, the Commission is unable to cite to us any authority in which a double leveraging adjustment or a consolidated capital structure has been applied where a substantial minority interest exists.[29] Our own research discloses very limited circumstances where the interest of a minority ownership has been subjugated to the general interest of the ratepayers. *See Re Pacific Northwest Bell Telephone Company*, 100 P.U.R. 3d 82, 102–03 (Or.Pub.Util. Commissioner 1973); *Re Pacific Telephone and Telegraph Company*, 91 P.U.R. (N.S.) 122, 125 (Idaho Pub.Util.Comm.1951).

■ The Commission's application of the double leveraging adjustment arises against a general background which discourages such action where a substantial minority interest exists. In the light of these circumstances, the Commission cannot summarily dispose of the minority shareholder issue. When claims of confiscation might arise because of a novel approach by the Commission, it must make adequate findings of fact and develop sufficient evidence in the record to enable this Court to decide upon the reasonableness of its actions. We cannot approve the Commission's actions in a factual vacuum. What is needed in this case are findings of fact, supported by substantial evidence, concerning the precise effect of the Commission's application of the double leveraging adjustment upon the interests of the 14% minority and, in turn, the ultimate effect, if any, upon New England Telephone. Only then can we determine the reasonableness of the result reached by the Commission.

We find that such findings and evidence are lacking in this case. The Commission did find that it was more appropriate, in the light of the existence of the 14% minority, to apply the double leveraging adjustment to 86% of New England's common equity, rather than to impute the consolidated capital structure of the Bell system *in toto* onto New England, as recommended by Mr. Kosh. However, applying double leveraging to just 86% of New England's common equity still lowers the average return on the 14% minority's shares from 11.5% to 10.14%. The Commission has failed to adequately explain this result.

The decree's only attempt to analyze the effect of double leveraging states:

An adjustment for the effects of double leverage does not mean the minority stockholders will not, in the future, earn their cost of capital. It is well recognized that investors earn their return on the price they pay for the stock of the Company. In their words, the return earned on book value does not represent the return earned by the minority stockholders. Neither this Commission nor the Company controls what the minority stockholders will in fact earn. *Re New England Telephone and Telegraph Co., supra* at ——.

The statement falls considerably short of the findings of fact we require to make a determination of the reasonableness of the Commission's actions.

Also, the record is greatly lacking of evidence to support double leveraging, where a substantial minority exists. The Commission's principal witness on this issue, Mr. Kosh, focused his testimony and supporting documents upon the propriety of the consolidated system approach to wholly-owned subsidiaries. Although he recognized that the main cause of disagreement between him and New England's witness on this issue arose from the existence of the 14% minority, Mr. Kosh gave little direct consideration to the effect of his approach where such a substantial minority existed. Acknowledging that the 14% minority might be disadvantaged by accounting for double

**29.** *In re Princeton Water Company*, 61 N.J. 141, 293 A.2d 377 (1972) is distinguished by the fact that the parent owned 99.74% of the subsidiary, which was treated by the Court as "substantially wholly owned". *Id.* at 379. *See also* our discussion of *Bristol County Water Co. v. Harsch, supra*.

leverage in this case, he viewed the issue as fairness to the ratepayers versus fairness to New England's minority investors. However, he failed to provide any adequate analysis of this conflict or of its effect upon the ultimate question of a fair rate of return for New England.

We are unable to determine what is the precise effect of the double leveraging adjustment upon the 14% minority. Therefore, we cannot sustain the Commission on this issue. This is not necessarily because we are concerned with the economic well-being of New England's shareholders, but because we are primarily concerned with the decree's ultimate effect upon New England itself and its ability to collect just and reasonable rates. As the Supreme Court has said, the concept of just and reasonable rates requires sufficient revenue to provide an adequate return to the utility's investors. *Federal Power Commission v. Hope Natural Gas Co., supra; Bluefield Water Works & Improvement Co. v. Public Service Commission, supra.* Upon the record before us we cannot find that the Commission's double leverage adjustment will allow New England to continue to provide a sufficient return to all of its equity investors.

█ We hold that the Commission cannot apply a double leveraging adjustment in this case, because its findings of fact and the record fail to support such an adjustment. Accordingly, we remand to the Commission to recalculate a fair rate of return, based upon the existing record. The Commission shall give adequate consideration to the existence of the 14% minority, which we find that it failed to do in this case. We do *not* remand for the further findings of fact and supporting evidence, which might support a double leveraging adjustment in this case for two reasons. First, New England's application for a rate increase has been pending since 1974, and must be brought to a final resolution as soon as possible. Second, the development of the findings of fact and supporting evidence we contemplate as necessary in this case would require additional time, effort and expense which cannot be justified at this time. Therefore, we conclude that the Commission's double leveraging adjustment cannot be sustained upon the record in this case.

## IV.

## ATTRITION

We recently described the concept "attrition" in *Central Maine Power Co. v. Public Utilities Commission,* Me., 382 A.2d 302 (1978):

"Attrition", the tendency of the actual rate of return to diminish, has been said to result from two factors:—(1) steadily increasing construction costs, and (2) calculation of the rate of return in the year prior to that for which the return is calculated. *Id.* at 316, n. 18.[30]

New England and the Commission are agreed that New England's future earnings will suffer attrition and that the rates established by the decree must compensate for such erosion of the rate of return. Accordingly, both New England and the Commission's Staff presented testimony as to methodologies and data in order to establish rates that would maintain New England's allowed rate of return through the year ending June 30, 1978, the year immediately after the new rates were expected to become effective. However, both sides differed as to the method to be used and the result reached.[31] New England argued for acceptance of its 1978 "projected test year" approach. The Staff presented testimony based upon an "historic" 1976 test year plus an attrition allowance. The Commission followed the recommendations of the Staff witness, with certain adjustments, and found that an attrition allowance of .56%

---

**30.** *See generally,* E. Nichols, *Ruling Principles of Utility Regulation—Rate of Return* 158–69 (1954); 55–65 (Supp. A 1964); 1 A. Priest, *Principles of Public Utility Regulation* 203–06 (1969).

**31.** A discussion of some of the alternative methods to account for attrition may be found in the New Jersey Supreme Court's opinion in *State v. New Jersey Bell Tel. Co.,* 30 N.J. 16, 35, 152 A.2d 35, 46 (1959), which includes a helpful discussion of the attrition issue.

should give the Company every opportunity to maintain the 8.73% fair rate of return as authorized by the Commission at least for the year through June 30, 1978. *In Re New England Telephone and Telegraph Co.,* —— P.U.R. 4th ——, —— (Me.Pub.Util.Comm.1977).

We find no error in the findings and reasoning of the Commission with respect to the attrition allowance. (However, upon remand, the Commission will be required to recompute its attrition allowance in light of our decisions with respect to other issues including its flow-through of federal income taxes deferred by use of accelerated depreciation and its application of the double leveraging adjustment.)

New England's witness, Mr. Joseph R. Katra, Jr., presented testimony which sought to directly establish New England's revenue needs for the year ending June 30, 1978. Relying upon historical data and management forecasts with respect to crucial factors affecting New England's level of operation, he projected the Company's revenue needs for that year. Forecasts of telephone, employee, and plant investment levels, which were regularly used in the management of New England's business, were fed into a computer program which provided an analysis of the Company's revenue needs for a future period of time. Thus, Mr. Katra's testimony concerning revenue requirements focused upon what New England projected its revenue needs to be for the year ending June 30, 1978.[32]

On the other hand, the Commission Staff's witness, Mr. Bruce M. Louiselle, relied upon the more traditional "historic test year" approach, with a separate allowance for attrition. Thus, his calculation of New England's revenue requirements was based upon factors combined to produce the 8.90% rate of return for 1976, recommended by Staff witness, Mr. David A. Kosh. Mr. Louiselle then analyzed the growth rates of the three basic factors of revenues, expenses, and rate base. Based upon this analysis he calculated or "projected" their

expected values for the year ending June 30, 1978. He then determined that, if these values held true, New England would realize a rate of return of only 8.50% by the end of that year. Therefore, he concluded that New England would suffer an attrition of .40% (8.90%–8.50%) over this period of time, for which an allowance must be made.

The Commission generally adopted Mr. Louiselle's testimony concerning attrition allowance, including the growth rates of revenues, expenses and rate base. However, the Commission did make some adjustments to his proposed growth rates for a few factors. According to its calculation, the Commission determined that New England would earn a rate of return of 8.17% during the year ending June 30, 1978. When compared to the 8.73% rate of return found reasonable by the Commission for the 1976 test year period, this resulted in an attrition of .56% (8.73%–8.17%) over this period of time. Based upon a rate base of $214,614,000, a .56% attrition allowance equated to a return allowance of $1,202,000, which requires a revenue allowance of $2,673,000 when state and federal income taxes are considered. Thus, the Commission found an attrition allowance of $2,673,000 to be fair and reasonable.

New England contends that the Commission's decree concerning the attrition allowance erred in two respects: (1) in rejecting the projected test year approach proposed by New England; and (2) in adopting, with modifications, Mr. Louiselle's attrition study. We find no merit in either contention.

As we repeatedly emphasize throughout this opinion, the Legislature has vested the Commission with the authority and duty to exercise its expertise and skill in the setting of just and reasonable rates. The Commission must necessarily be allowed to exercise wide discretion in setting rates, which is essentially a legislative function. Our role upon review is limited to the consideration of errors of law. We may not

---

**32.** New England's brief reveals that an "attrition allowance" of .76% would have been necessary to achieve the revenue level required by Mr. Katra's "projected test year" approach.

interfere with the Commission's findings if the methodology and result are reasonable and are supported by substantial evidence in the record. The Commission may exercise reasonable discretion in selecting methods by which to establish just and reasonable rates. It is not bound to any particular methodology, whether suggested by its own Staff or by the utility.

Although the Commission may not ignore the evidence before it, neither may a utility place the burden upon the Commission to demonstrate the inadequacy of a suggested methodology. This is so for two important reasons. First, the placing of such a burden upon the Commission would unreasonably interfere with its ratemaking tasks and would enable a party (including a utility or an intervenor) to unreasonably delay its proceedings. Second, our study of the issues presented in this case reveals that there are a multitude of acceptable methodologies available to the ratemaker. To require the Commission to demonstrate that its methodology is superior to those suggested would be unrealistic and unreasonable. It is sufficient that the Commission give reasonable consideration to a suggested methodology and state its reasons for rejecting same. The Commission's decree did both to our satisfaction.

In our most recent *Central Maine Power Co.* decision, we considered similar arguments. In that case Central Maine Power had presented testimony demonstrating the utility's past experience with attrition and requesting an allowance therefor. However, a Staff witness testified that Central Maine Power would experience no attrition in the near future. The Commission accepted the Staff witness's study as reasonable, and refused to make any allowance for attrition. Central Maine attacked the use of the Staff witness's data as improper methodology.

We found no error in the findings and reasoning of the Commission. Viewing the difference between Central Maine Power and the Commission as one of methodology rather than of fact, we stated:

At most, the Commission was faced with a conflict in the evidence. Central Maine urged an inference from past experience, that such experience—attrition—would occur in the relevant future. The Staff study, also based on the past but emphasizing a greater range of years, led to a contrary conclusion. The Commission's choice to rely on the Staff study was properly within its powers.

Neither do we discern error in the rejection of most of Central Maine's attack on the methodology of the Staff study. *Choice of method to compute such factors as attrition, at least in the realm where rational persons could disagree, belongs to the Commission.* 382 A.2d at 317 (emphasis added, footnote omitted).

Rejection of New England's methodology and adoption of Mr. Louiselle's methodology was properly within the discretion of the Commission.

New England's second ground for objection goes more to the heart of the issue before us, *i. e.,* whether the Commission's attrition allowance was reasonable in result and whether it was supported by substantial evidence. The Commission's determination of the revenue increase required to compensate for attrition involved a two-step process. First, actual information was gathered with regard to the historic test year of 1976. Second, the effect of the growth rates of various factors were used to project the 1976 figures to the year ending June 30, 1978. Thus, while New England's approach involved essentially a one-step direct projection to June 30, 1978, the Commission's approach was anchored in the actual figures of the 1976 test year. The desired result is the same. In fact, New England's brief admits that the use of an historical test year with an attrition allowance is the equivalent of a projected test year.

We approved the Commission's use of an historic test year in *Central Maine Power Co. v. Public Utilities Commission,* 153 Me. 228, 136 A.2d 726 (1957), but we have also made it clear

that the experience of one test year is not the sole factor to be considered by the Commission. *Central Maine Power Co. v. Public Utilities Commission, supra* at 317 (1978).

In this case the Commission did not limit itself to a mere consideration of the circumstances as they existed during the historic test year. Rather, it sought to account for the effects of attrition over a period of time. We uphold the Commission's actions in this respect.

New England's objections center upon alleged errors in the calculation of the growth rates of three of the expense items used in Mr. Louiselle's attrition analysis. Accordingly, it argues that the Commission lacked substantial evidence to support its findings with respect to attrition. We disagree.

(1) The most significant issue concerns Mr. Louiselle's growth rate of 8% for wage, salary, and benefits expense, which the Commission adopted. New England projected a 10% annual increase in this expense, and argues that the 8% figure is erroneous for three reasons.

First, New England claims that "wage creep" (the increase in wage costs due to changes in seniority and skill mix) is not offset by increase in employee productivity, as asserted by Mr. Louiselle. Although Mr. Louiselle's study on this issue might contain some inconsistencies, as argued by New England, we find that on the whole it provided substantial evidence to support a finding of no "wage creep."

Second, New England claims that Mr. Louiselle incorrectly analyzed the import of a current national steel contract settlement. We find that Mr. Louiselle gave adequate consideration to this factor.

Third, New England complains that the Commission's decree places undue reliance on the current level of management salaries to justify the 8% growth rate. The Commission's consideration of management salaries, as one of the many factors to be weighed, was a proper exercise of its discretion.

(2) New England claims that the Commission's reduction of the growth rate for the materials, rents, and services category of expense, from the 13.5% recommended by Mr. Louiselle to 12.0%, was erroneous. The Commission stated that its reduction was based on its expectation that the prices for such services as fuel and electricity would not continue to increase at the same high rate as in recent years. Such a determination was within the Commission's area of expertise and supported by the record.

(3) Finally, New England argues that the Commission's adoption of Mr. Louiselle's annual growth rate of 8% for payroll taxes was without support in the record. Mr. Louiselle admitted that the payroll tax growth rate is difficult to determine because of changes in the number of employees, changes in the tax rate and the income level to which it is applied, and changes in wages per employee. However, we find no error in the Commission's adoption of Mr. Louiselle's reasoned suggestion that the same growth rate be assigned to payroll taxes as to wages. These constant changes in the factors affecting payroll taxes require the type of reasoned estimates made by Mr. Louiselle, and adopted by the Commission upon substantial evidence in the record.

We find that the Commission's calculation of an attrition allowance of .56% was reasonable and supported by substantial evidence. The Commission's decree contains adequate findings with respect to attrition and a sufficient analysis of the testimony and data supporting its findings. Although we approve the Commission's attrition allowance, it must recalculate its value, based upon our decisions with respect to other issues, such as its flow-through of taxes deferred by use of accelerated depreciation and its double leveraging adjustment.

## V.

### WORKING CAPITAL ALLOWANCE— CASH ADVANCED FOR EXPENSES

Both the Commission and New England are agreed that, in addition to fixed plant

and property, New England's rate base must include an allowance for "working capital". Working capital consists of the additional funds, provided by the investors, which may be required by the utility to meet its day-to-day operating expenses, such as maintaining an inventory of materials and supplies, meeting certain operating expenses which must be paid before the revenues associated with these expenses are received, and keeping a certain amount of cash on hand for daily operations.

The issue before us involves one particular item included in the working capital, i. e. "cash advanced for expenses." The Third Circuit's opinion in *Alabama-Tennessee Natural Gas Co. v. Federal Power Commission*, 203 F.2d 494 (3d Cir. 1953), explains the function of this item:

> "Working capital", in the context of public utility rate regulation, has been defined as the "allowance for the sum which the Company *needs to supply from its own funds* for the purpose of enabling it to meet its current obligations as they arise and to operate economically and efficiently." Barnes, The Economics of Public Utility Regulation (1942) 495. Since it is normally contemplated that all operating expenses will eventually be paid for out of revenues received by the Company, the need for working capital arises largely from the time lag between payment by the Company of its expenses and receipt by the Company of payments for service in respect of which the expenses were incurred. 203 F.2d at 498 (emphasis in original).

*See generally*, 1 A. Priest, *Principles of Public Utility Regulation* 183–87 (1969).

In a widely quoted statement, the Pennsylvania Supreme Court described this item thusly:

> Cash working capital ordinarily is the amount of cash required to operate a utility during the interim between the rendition of service and the receipt of payment therefor.
>
> *City of Pittsburgh v. Pennsylvania Public Utility Commission*, 370 Pa. 305, 309, 88 A.2d 59, 61 (1952).

This interim period is known in the utility industry as the "lag". *Rhode Island Consumers' Council v. Smith*, 113 R.I. 232, 237, 319 A.2d 643, 646 (1974).

As the Court explained in *Alabama-Tennessee Natural Gas Co. v. Federal Power Commission, supra*, such lag may work in both directions:

> But there are time lags which work in favor of the Company as well as those which work against it. The Company no more pays immediately every liability accrued than do its customers. In determining the need for working capital, the Commission may quite reasonably and properly take into account factors which reduce the need as well as those which increase it. 203 F.2d at 498.

Although the Commission's decree and the briefs of the parties provide little explanation of the function of "lag days", we have gathered the following understanding from our reading of the record on this matter. As indicated earlier, the utility's receipt of revenues or customer payments for services provided often tends to lag behind the date upon which the utility incurred expenses with respect to the provision of such services. Thus, the utility requires a "cash advanced for expenses" working capital allowance to cover expenses during those lag days. The calculation of the utility's "net lag" involves the subtraction of its average expense lag from its average revenue lag. Revenue lag is simply the time span over which revenues lag behind expenses. On the other hand, expense lag involves the converse situation, where the utility's expense payments lag behind the date upon which the utility receives the products or services for which it is paying. This is the type of time lag the Court in *Alabama-Tennessee Natural Gas Co. v. Federal Power Commission, supra*, described as working in favor of the utility and, which negates the need for working capital. Thus, the revenue lag and the expense lag are combined to determine the net lag days for which the utility requires cash working capital. The License Contract payments at issue involve an expense lag, in

that the Commission found payment of the License Contract expense lagged 55 days behind the time when such service was provided, thereby reducing the amount of cash working capital required by New England.

Under the License Contract dated July 15, 1930, American Telephone & Telegraph provides considerable services and privileges to New England, including the use of patents, research and development, advice and assistance in matters concerning the conduct of business, and advice and assistance in financing. The contract originally provided that American Telephone & Telegraph was to receive payment for its services as follows:

In consideration of the premises and for all benefits accruing to the Licensee hereunder, the Licensee shall pay to the Licensor a sum equal to two and one-half per cent. (2½%) of the total gross earnings of the Licensee, which shall be payable in monthly installments, as herein provided, and in accordance with the established practice of the parties hereto, and shall be computed as follows:

. . . . .

The amount of each installment of said sum equal to two and one-half per cent. (2½%) of the Licensee's total gross earnings due for each month shall be determined by such total gross earnings of the second preceding month, computed in the manner aforesaid, and a statement, over the signature of the proper accounting officer of the Licensee, of its total gross earnings for each calendar month, computed in the manner aforesaid, shall be sent to the Comptroller of the Licensor, or to such other officer of the Licensor as it may theretofore designate, on or before the twenty-fifth day of the next succeeding month and payment in New York funds shall be made on or before the

tenth day of the month next following, that being the month for which such payment is due.

Since October 1974, American Telephone & Telegraph accepts, as payment for services rendered, New England's *allocated share of the actual costs incurred by American Telephone & Telegraph* in rendering License Contract services, but not to exceed the rate of 2½% of gross earnings provided in the contract. New England receives its bill from American Telephone & Telegraph for services rendered under the License Contract, on the first day of the month and pays it 9 days later. (Lag days are generally measured from the middle of the month during which the services are rendered.)

New England argues that, under the License Contract, the bill it receives on the first of the month is for an expense incurred *during that month*.[33] In other words, the payment it makes during a particular month is for an expense incurred in that month. Thus, New England calculates an expense lag with respect to License Contract payments of about negative 6 days (payment made on the ninth day of the month for an expense "incurred" during the middle of same month).

The Commission rejected New England's approach and found that payments for License Contract services lagged 55 days *behind* the date the expense was incurred (45 days from the middle of the second preceding month to the first of the month when the bill is received plus 9 days until the bill is paid). The Commission reasoned that the expense was "incurred" during the month which was used to determine New England's allocated share of AT&T's cost of rendering such service. In other words, New England incurred the expense during the same month AT&T incurred the cost in rendering its License Contract service, *i. e.* the second preceding month.

---

33. New England's brief argues as follows:

The contract explicitly provides that the payment made *in* a given month is *for* that month, "that being the month for which such payment is due," and not for the second preceding month's revenues. Mr. Katra explained the accounting for these payments as follows: "The License Contract fee is ex-

*pense of the New England Company,* as well as revenue to the American Company, in [the month paid]." (NET Exh. 54, p. 2) The contract thus explicitly provides that the payment, even though computed on the figures for the second preceding month, applies to the *current month in which due and payable.*

This is the same method the Commission used to determine New England's License Contract *expense* (as opposed to "License Contract expense lag" for working capital purposes) for the 1976 test year. The Commission found that, for ratemaking purposes, New England's License Contract expense for 1976 was not the payments actually made to AT&T in 1976, but, rather, was New England's allocated share of the costs incurred by AT&T *while rendering License Contract services during 1976.* The Commission stated:

New England Telephone's test year expenses should be based upon the incurrence of costs, not a cash payment, and that test year revenues should be based on the rendering of service, not cash receipts. Such accrual accounting techniques, in our opinion, produce a proper matching of test year revenues and expenses. *Re New England Telephone and Telegraph,* —— P.U.R. 4th ——, —— (Me. Pub.Util.Comm.1977).

The Commission reasoned,

once the proper amount of test year expense is determined, the lag days automatically follow. *Id.* at ——.

Accordingly, it determined New England's 1976 License Contract expense and New England's License Contract expense lag days on the basis that the expense was incurred during the month that AT&T incurred its costs which were to be allocated to New England under the contract. Therefore, New England's License Contract payment during any particular month was for services rendered and expenses incurred with respect to the second preceding month.

■ We find no error in the Commission's reasoning. New England argues that this issue is controlled by its interpretation of the provisions of the License Contract. We disagree. This is not a matter of contract law, but is a matter of regulatory law.

The Commission is not bound by the provisions of the contract for these purposes. It must make an independent and reasoned judgment as to when the License Contract expense is incurred for rate-making purposes. As we recently stated in *Mechanic Falls Water Co. v. Public Utilities Commission,* Me., 381 A.2d 1080 (1977),

[W]e know of no legal requirement that the Commission accept the Companies' method of bookkeeping in setting an appropriate service fee. *Id.* at 1099.

■ We find that the Commission's approach is a reasonable method to account for expenses incurred during the 1976 test year. The Commission relates expenses to the time when they are incurred with respect to the utility's rendition of services to its customers and not to the time when the utility chooses to pay its bills. For example, New England's allocated share of costs incurred by AT&T in rendering License Contract services in October are treated as an expense incurred in October by New England and not as an expense incurred in December when New England pays its bill to AT&T, which bill is calculated on the basis of AT&T's October costs. Thus, expenses are "matched" with services rendered and revenues received. The Commission's finding of a 55-day lag for the License Contract expense was reasonable and supported by substantial evidence.[34] We find no error therein.

## VI.

## PRE–1971 INVESTMENT TAX CREDITS

Federal income tax law provides tax credits—a reduction in actual taxes paid—for certain kinds of capital investment. New England accumulates these credits in a separate account and then amortizes them over the life of the investment giving rise to the credit. In this case the Commission

---

**34.** New England's brief argues that the Commission's refusal to adopt a 55-day lag in *Re New England Telephone and Telegraph Co.*, 13 P.U.R. 4th 65, 79 (Me.Pub.Util.Comm.1976), precludes its use here. We disagree. Ratemaking is a legislative function. The Commission has the authority and duty to determine just and reasonable rates by methods that are reasonable and supported by substantial evidence. It is not bound by its approach in prior cases as long as this standard is satisfied. To hold otherwise would constitute unwarranted interference with the authority and discretion vested in the Commission by the Legislature.

deducted from New England's rate base $875,000 of pre-1971 investment credits remaining unamortized in 1976. New England argues that the deduction was erroneous in that it contravened federal tax policy and ratemaking principles. We find no error in the Commission's actions with respect to the pre-1971 investment tax credits.

The investment tax credit was introduced in 1962 as §§ 38 and 46–48 of the Internal Revenue Code of 1954, 26 U.S.C.A. (Pub.L. 87–834 § 2(a)(b), 76 Stat. 960 (1962)). Under those provisions, public utilities were granted a "tax credit" of 3% of their investment in certain newly acquired assets. Accordingly, New England was entitled to a reduction in taxes in the amount of such investment tax credits. New England did not use these tax savings to reduce its tax expense for the purposes of establishing rates, that is, it did not pass the tax savings on to its ratepayers.[35] Instead, New England chose to "normalize" the investment tax credits by determining its tax expense for ratemaking purposes, as if it had received no such credits. In accounting for these tax savings, New England accumulated the tax credits in a separate account and amortized them over the useful life of the investment giving rise to them. The annual amortization amount was then credited to New England's annual earnings, thereby reducing its revenue requirements for that year. Although the investment tax credit was terminated in 1969 (Pub.L. 91–172 § 703, 83 Stat. 660 (1969)), $875,000 of such credits remained unamortized in 1976. The Commission's decree reduced New England's rate base in that amount. (The investment tax credit was reinstituted in 1971 as the Job Development Investment Credit. (26 U.S.C.A. §§ 38, 46–8, Pub.L. 92–178 § 101, 85 Stat. 498 (1971)).

The Commission treated the unamortized pre-1971 investment tax credits as consum-

er supplied capital, on which New England's investors were entitled to no return. The ratepayers had supplied revenues to compensate New England for tax payments which were not actually made to the federal government, but were accumulated in a separate account. The Commission adopted Mr. Louiselle's testimony that

> these accumulated tax credits represent funds which have been provided by ratepayers, not investors. We conclude that the Company is not entitled to be allowed to earn a return on such consumer contributed capital . . .. We therefore reduce rate base by the amount of accumulated pre-1971 investment tax credits. *Re New England Telephone and Telegraph,* —— P.U.R. 4th ——, —— (Me.Pub. Util.Comm.1977).

New England raises a number of objections to the Commission's deduction of unamortized pre-1971 investment tax credits from its rate base. We find these objections unpersuasive.

New England argues that the Commission's actions of reducing its rate base prevents it from earning a fair rate of return on all of its property devoted to public service. However, as the Commission emphasizes, New England's investors are entitled to a return upon only that capital which has been supplied by the investors. Accordingly, New England is entitled to no return on capital supplied by consumers through their rate payments for a tax expense not actually paid to the federal government. We hold that this determination is properly within the discretion of the Commission and is entirely reasonable under the law and the facts of this case.

New England also argues that the Commission's decision is contrary to the policy of Congress in enacting the investment tax credit.[36] The Commission agrees that fed-

---

**35.** Some state regulatory agencies required immediate flow-through of such tax savings to the ratepayers. 1 A. Priest, *Principles of Public Utility Regulation* 138, n. 309 (1969).

**36.** New England states in 1964 Congress repealed the part of the investment tax credit

section that permitted deduction of the credit from the asset's depreciation basis (Pub.L. 88–272 § 203, 78 Stat. 33 (1964)). That act barred federal regulatory agencies from depriving utilities of the benefit of the investment tax credit by reducing the allowed depreciation basis or by any other similar method. After being ter-

eral tax law prohibits *federal* regulatory agencies from deducting these credits generated since 1964 and denies post-1971 tax credits where such credits are deducted by a federal or state regulatory agency from rate base. However, federal law is silent concerning *state* regulatory action with respect to pre-1971 investment tax credits. Whatever may be the federal policy and expectations with respect to other than pre-1971 investment tax credits, it does not control the Commission's actions in this case. Congress has apparently left the treatment of pre-1971 investment tax credits to the individual states. Therefore, the Commission could properly exercise its discretion and deduct such tax credits from New England's rate base.

▮ Finally, New England argues that the Commission's decision in this case is an improper deviation from its treatment of New England's pre-1971 investment tax credits in prior cases. The Commission is not bound by its treatment of rate base items in prior cases. Ratemaking is a legislative function and the Commission has the authority and duty to make an independent determination of the justness and reasonableness of rates in each case. As long as the Commission satisfies the requirements of legality and reasonableness, it may utilize a different ratemaking approach in a subsequent case.

▮ We conclude that the Commission's exclusion of the unamortized portion of the pre-1971 investment tax credits from New England's rate base was reasonable and justified. The cases cited by New England [37] demonstrate only that this is a decision which lies within the discretion of the Commission. We hold that the Commission properly exercised its discretion with respect to this issue and find no error therein.

minated in 1969 (Pub.L. 91–172 § 703, 83 Stat. 660 (1969)) the investment tax credit was reinstituted in 1971 as the job development investment tax credit (Pub.L. 92–178 § 101, 85 Stat. 498 (1971)). I.R.C. § 46(f)(1)(B) now specifically denies a post-1971 tax credit to any utility whose rate base is reduced with respect thereto by a federal or state regulatory agency.

## VII.

### CHARITABLE CONTRIBUTIONS AND LEGISLATIVE EXPENSE

The Commission disallowed for ratemaking purposes $16,000 of charitable contributions and $1,000 of legislative or lobbying expenses. New England challenges the deduction of these sums from its operating expenses as being without support in the record. We find no error in the Commission's actions.

#### a. Charitable Contributions

The Commission deducted $16,000 of charitable contributions from New England's operating expenses for ratemaking purposes. In so doing, the Commission adhered to its established policy

that ratepayers should not be charged for these expenses and that the Company's contributions and involvements in charitable activities should be borne by stockholders. *Re New England Telephone and Telegraph*, —— P.U.R. 4th ——, —— (Me. Pub.Util.Comm.1977).

This finding was based upon Staff witness Mr. Bruce M. Louiselle's testimony that such contributions were not related to and did not improve the quality of telephone service, that they were not necessary to enhance its goodwill because it was a regulated monopoly whose service area is protected by law, and that ratepayers should not be forced to make contributions through their telephone rates. We find that this testimony supplies a sufficient basis for the Commission's decision.

▮ The allowance or disallowance of charitable contributions as a ratemaking expense is inherently a policy decision.[38]

**37.** *Rhode Island Consumers' Council v. Smith*, 113 R.I. 232, 241, 319 A.2d 643, 648–49 (1974); *Re New England Telephone and Telegraph Co.*, 13 P.U.R. 4th 468, 471 (Vt.Pub.Serv.Bd.1976).

**38.** The great conflict among jurisdictions on this issue demonstrates that the treatment of charitable contributions is largely a matter of public policy. *See* Annot. "Charitable Contri-

The Legislature has appropriately vested the Commission with discretion concerning such matters. This Court

> cannot review the judgment of the Commission as to public policy or the discretion vested in it [by the Legislature]. *In re Samoset Co.*, 125 Me. 141, 143, 131 A. 692, 693 (1926).

Whether or not a utility's charitable contributions should be included in its operating expenses for ratemaking purposes becomes a question of fact for the Commission.

> This Court has no right to substitute its judgment on the facts for that of the Commission. *In re O'Donnell's Express*, Me., 260 A.2d 539, 546 (1970).

The Commission's findings of fact, if supported by substantial evidence, in the record, are final. *In re Powell*, Me., 358 A.2d 522, 528 (1976). We find that the Commission's decision is supported by substantial evidence.

New England argues that the Commission's action is erroneous because it allegedly fails to make a specific finding that the charitable contributions are unreasonable. It quotes language from our decision in *Central Maine Power Co. v. Public Utilities Commission*, 153 Me. 228, 136 A.2d 726 (1957), concerning promotional expenses:

> The question is whether "it clearly appears that the expenses are excessive or unwarranted," or, stated differently whether expenses in excess of the allowance by the Commission are "within the limits of reason." 153 Me. at 244, 136 A.2d at 736.

From this statement New England argues that the Commission's alleged failure to make such a finding that the charitable contributions were excessive, unwarranted or unreasonable renders its finding erroneous. We find no such error.

The Commission's disallowance of the contributions is equivalent to a finding they are unwarranted. Moreover, such findings as demanded by New England are implicit in the language of the Commission's decree. It is not necessary that the Commission express itself in the same language found in the above quotation. It is sufficient that it find, upon substantial evidence, that the charitable contributions are not proper as an operating expense for ratemaking purposes.

Moreover, our language in *Central Maine Power Co.* is directed to the reasonableness *in amount* of an expense considered to be a proper charge to operating expenses for ratemaking purposes. The Commission had not disallowed all promotional expenses, but only that portion which it found to be excessive. Thus, we assumed,

> In general, promotional expense of the nature under discussion may properly be charged to operations. 153 Me. at 244, 136 A.2d at 737.

There is no such general assumption in this case. Here the Commission found that the ratepayers should not be charged for charitable contributions made by New England in general. The proper amount of such contributions is not in question. Our language in *Central Maine Power Co.* must not be so taken out of context.[39]

We conclude that the Commission's disallowance for ratemaking purposes of $16,000 of charitable contributions was a reasonable exercise of its discretion and supported by substantial evidence.

### b. Legislative Expense

The Commission deducted $1,000 of legislative or lobbying expenditures from New England's operating expenses for ratemaking purposes. In so doing, the Commission adhered to its established policy of disallowing lobbying expenses. In rebuttal to New England's argument that the ratepayers

---

butions By Public Utility As Part Of Operating Expense," 59 A.L.R.3d 941 (1974).

**39.** New England might note that the following dictum is also found in our opinion in *Central Maine Power Co.*:

> [C]ontributions to charity come from the stockholders. 153 Me. at 233, 136 A.2d at 731.

may benefit from its efforts to influence legislation, the Commission stated, "Clearly ratepayers may also suffer from the Company lobbying efforts." *In Re New England Telephone and Telegraph Co., supra* at ——. We find no error in the Commission's actions.

 As in the case of charitable contributions, the allowance or disallowance of lobbying expenses is a matter properly within the discretion of the Commission. We will not interfere with an exercise of discretion, where, as here, it is reasonable and supported by substantial evidence.

New England again claims that the Commission failed to make specific findings that the lobbying expenditures were excessive, unwarranted or unreasonable. As we found with respect to New England's charitable contributions, there is no error in the Commission's actions under our decision in *Central Maine Power Co. v. Public Utilities Commission, supra* (1957). It's decree contains sufficient findings supported by the record.

 We conclude that the Commission's disallowance for ratemaking purposes of $1,000 for legislative expenditures was a reasonable exercise of its discretion and supported by substantial evidence.

## VIII.

### COMMISSION AUDIT

The Commission found that there was a need to "tighten up" New England's accounting practices for certain expenses and that New England's existing accounting practices prevented the Commission from effectively performing its ratemaking functions. In response to these concerns, the Commission's degree contained the following:

> We will, therefore, require an analysis and audit of the Company's accounting practices and its System of Accounts to be performed by an independent outside firm approved by us and reporting to us. We will require the Public Utilities Commission Staff be involved in preparing the specifications and in monitoring the work while it is in progress. *The audit will initially be paid for by New England Telephone, but it will be permitted to be amortized in a future rate case as fairness dictates. Re New England Telephone and Telegraph*, —— P.U.R. 4th ——, —— (Me.Pub.Util.Comm.1977) (emphasis supplied).

New England objects to this aspect of the decree, claiming that it exceeds the statutory authority of the Commission. New England does not differ with the Commission over its authority to order and conduct such an audit. However, it does challenge the Commission's authority to require New England to bear the costs. We agree and sustain New England's objections.

The governing principles of law are well settled.

> The Commission has no life except as life is given by the Legislature. *Auburn Water District v. Public Utilities Commission*, 156 Me. 222, 226, 163 A.2d 743, 744–5 (1960).

It is axiomatic that

> the powers of the Public Utilities Commission are derived wholly from statute. *Stoddard v. Public Utilities Commission*, 137 Me. 320, 323, 19 A.2d 427, 428 (1941).

> The Public Utilities Commission is an administrative body of limited, though extensive, authority, having such powers as are expressly delegated to it by the Legislature, and incidental powers necessary to the full exercise of those so invested. *City of Rockland v. Camden & Rockland Water Co.*, 134 Me. 95, 97, 181 A. 818, 819 (1935).

We find no express or necessary "incidental" statutory authority for the Commission's requirement that New England bear the cost of the audit.[40]

---

**40.** The Commission argues that this question is not ripe for judicial review until such time as New England undertakes the required audit and the costs thereof are known and specifical-

ly addressed by the Commission in some future ratemaking order. We disagree. The "ripeness" doctrine does not limit our jurisdiction, but is, instead, a doctrine of judicial restraint in

New England presents to us and our research discloses no statute authorizing the Commission to order a utility to bear the cost of a Commission instituted investigation. The Legislature has authorized the Commission to investigate and obtain information from a public utility, 35 M.R.S.A. § 4, and to inspect the books and records of a public utility, 35 M.R.S.A. §§ 6–7. The Commission is also authorized to prescribe the method of accounting to be used by a public utility, 35 M.R.S.A. §§ 53 *et seq.*, and to audit its accounts, 35 M.R.S.A. § 59. However, no statute authorizes the Commission to impose the costs of such investigatory activities upon the utilities it regulates. Such power must and can only come from the Legislature.

Some states do statutorily authorize their utility regulatory agencies to charge the expenses of an investigation to the utilities they regulate. But no such power appears to exist without specific statutory authority. *See generally* 73 C.J.S. "Public Utilities" § 45, at 1113–4 (1951). Thus, the courts of a number of these states have overruled the imposition of various investigatory costs where such did not fall within any specific provision of the statute in question. *See United Gas Pipe Line Co. v. Louisiana Public Service Commission*, 279 So.2d 195 (La.1973) (expenses of special counsel employed by Commission held not to be included in statutory authorization of recovery of certain expenses of investigation); *State v. City of Newark*, 87 N.J.Super. 38, 207 A.2d 719 (1965), *aff'd* 90 N.J.Super. 68, 216 A.2d 246 (1966) ("municipality"

held not to be included within statute authorizing imposition of charges upon "Public Utilities"); *State v. Pacific Telephone and Telegraph Co.*, 27 Wash.2d 893, 181 P.2d 637 (1947) (expenses incurred upon appeal held not to be among costs of "investigation" recoverable under statute).

■ It appears to be generally accepted that a utility commission may not impose the costs of its investigations upon a utility without specific statutory authorization. No such statutory authorization exists with respect to the Commission's order in this case that New England bear the costs of the audit.[41] Accordingly, we hold that the Commission has no authority to impose the cost of an audit upon New England, and, we sustain New England's objections on this issue.

## IX.

### RATE DESIGN

In addition to calculating the proper return or revenue to be allowed a public utility, the Commission must also determine the appropriate charges for different classes of customers and services, which will generate the required "revenue level." These charges, which are reflected in the utility's rate schedules or tariffs, are the product of "rate design" or rate structure. *See generally* 1 A. Priest, *Principles of Public Utility Regulation*, ch. 8 (1969). In our recent decision, *Central Maine Power Co. v. Public Utilities Commission*, Me., 382 A.2d 302, 322–28 (1978), we clarified this distinction between "revenue level" and "rate de-

---

the exercise of our jurisdiction. *Lewiston, Greene and Monmouth Telephone Co. v. New England Telephone and Telegraph Co.*, Me., 299 A.2d 895, 907–8 (1973). We do not believe that such restraint is warranted in this case.

Although the audit has not yet been conducted, the Commission's decree specifically requires New England to bear the cost thereof. New England was ordered to assume the cost of the impending audit as soon as the Commission commenced such actions. The order to bear such costs was, therefore, immediate and ripe for review. In addition, we believe it is best to dispose of this issue now when we have the opportunity rather than require its future re-litigation.

41. The Commission argues that there is no actual cost being imposed upon New England because "it will be permitted to be amortized in a future rate case as fairness dictates," thereby allowing New England to "recoup" its initial cost. We disagree. New England's *ratepayers* will still be saddled with a cost unauthorized by the Legislature, whether New England bears the cost initially or amortizes over time. Moreover, the Commission's decree is worded so as to reserve to its future determination whether New England will actually be allowed to amortize the cost of the audit.

sign." The immediate issue concerns the Commission's decision concerning the latter.

During the proceedings before the Commission, New England presented what it considered to be an appropriate rate design to achieve the increased revenues which it claimed necessary to maintain adequate service and a proper rate of return. Not only did the Commission reject the revenue level requested by New England, but also it substituted its own version of an appropriate rate design. New England challenges the Commission's substituted rate design on two grounds. First, New England argues that the Commission's rejection of its proposed rate schedules improperly invaded managerial discretion, because it failed to find the proposed schedules unreasonable. Second, New England argues that the Commission's own rate schedules are not supported by the evidence.

Under the ratemaking system prescribed by the Legislature, the public utility bears the initial responsibility for preparing and filing rate schedules to meet its requested revenue requirements. Thus, a rate proceeding is usually initiated by the utility's filing of revised schedules with the Commission under 35 M.R.S.A. § 64. The Commission then has the power to temporarily suspend the filed schedule of rates while it considers their reasonableness. 35 M.R.S.A. § 69. Priest explains why initial rate design is for management:

> Once a utility's revenue requirements have been determined, initial rate design should be, and usually is, for management. In general, the utility knows more about the proper criteria than either a commission staff or opposition experts and therefore is best able to allocate burdens between classes of customers. Furthermore, responsibility for preparing and filing rates ordinarily is imposed on the utility by statute.
>
> To be sure, rate schedules are subject to review and correction by the agency. Initiating them is, however, a utility's job. Pot shots often are taken at tariffs after they are filed, but the first discretion to be exercised is that of manage-

ment. Priest, *supra* at 342–43 (footnotes omitted).

Accordingly, in this case, New England proposed a rate design which would generate its requested revenues. However, the Legislature has not bound the Commission to accept either the revenue level or rate design proposed by a utility.

> If upon such formal public hearing the rates, tolls, charges, schedules or joint rates shall be found to be unjust, unreasonable, insufficient or unjustly discriminatory or otherwise in violation of chapters 1 to 17, the commission shall have power to fix and order substituted therefor such rate or rates, tolls, charges or schedules as shall be just or reasonable.

35 M.R.S.A. § 294.

This section authorizes the Commission, in its discretion, to substitute reasonable rate schedules upon a finding that the schedules proposed by a public utility are unjust, unreasonable, insufficient, unjustly discriminatory, or otherwise in violation of law.

During the process of establishing rate schedules, the public utility and the Commission must be guided by certain ratemaking principles, which the Commission listed in its Decree:

> [The rate schedules must] (a) satisfy the Company's total revenue requirements for Maine intrastate operations; (b) assure uniform rates for services offered under like conditions throughout the State; (c) reflect the relationship of value that exists among various telephone services; (d) encourage patterns of subscriber use toward more efficient utilization of Company facilities; and (e) provide basic telephone service to as many potential subscribers as possible.

*Re New England Telephone and Telegraph Co.*, —— P.U.R. 4th ——, —— (Me. Pub.Util.Comm.1977). *See also Priest, supra,* at 329.

The balancing of these factors is a complex task, which properly lies within the Commission's area of expertise. We will not interfere with its decision if the result is reasonable and its findings are supported

by substantial evidence. We recognized these principles in *Central Maine Power Co. v. Public Utilities Commission, supra* :

> The concept of a "just and reasonable" rate does not signify a particular single rate as the only lawful rate but rather encompasses a range within which rates may be deemed just and reasonable both in terms of revenue level and rate design. *It is within the sound discretion of the Commission to fix the exact level and design within that range.* 382 A.2d at 327–28 (emphasis supplied).

We concluded in that case "that the Commission possesses a range of latitude in this area which it has not here abused." *Id.* at 328.

We need not now decide whether the Commission abused its discretion with respect to rate design in this case. We anticipate that our decisions on other issues in this case, such as the Commission's attempted flow-through of taxes deferred by accelerated depreciation or its double leveraging adjustment, will have a substantial effect upon the ultimate revenue level allowed New England. New England, in turn, will be required to file proposed rate schedules which will generate this new revenue level. The Commission may decide to accept these schedules or substitute new schedules of its own. Therefore, it is unnecessary for us at this time to consider the rate design imposed by the Commission's Decree, because we cannot ascertain which of its provisions, if any, will ultimately go into effect. Upon remand New England and the Commission shall be guided by the principles of rate design we have here discussed.

## X.

### OTHER ALLEGED ERRORS

New England raises nine other alleged errors in the Commission's June 10 Decree. Most of these objections pertain to Commission orders concerning certain business practices of New England or requiring the disclosure of certain information. We find no reversible error. We will briefly discuss each objection in the order raised by New England:

### a. Records of I.R.S. Contacts

The Decree ordered New England to keep and provide the Commission with a record of all contacts between New England's or AT&T's employees, agents, or representatives and the Internal Revenue Service concerning the effect of the Commission's decision on the availability of accelerated depreciation. New England contends that the order is overbroad and not supported by any finding or evidence that it is necessary.

■ We hold that the order lies within the powers granted the Commission by the Legislature, which has provided:

> The commission . . . shall have the right to obtain from any public utility all necessary information to enable the commission to perform its duties. 35 M.R.S.A. § 4.

*See also* 35 M.R.S.A. § 55, granting the Commission power over the books, accounts, papers, and records maintained by a public utility. As we have seen, the accelerated depreciation issue involves a considerable number of revenue dollars and greatly concerns both the Commission and New England. Accordingly, any communication with the I.R.S. on this subject is of considerable importance to the Commission. We hold that the Legislature has empowered it to obtain such information.

### b. Revised Line Extension Tariff

The Decree contains the following findings and order:

> The Company's present line extension policy requires the customer seeking service to pay the entire amount before service is installed. This practice is not consistent with the practice of electric utilities, a discrepancy which the Company defends on the basis of an allegedly greater likelihood that customers will terminate telephone service. This possibility is not great enough to justify the present onerous practice.

> We hereby require the Company to reevaluate this practice in consultation with our engineering staff and file no later

than July 8, 1977, a line extension arrangement contemplating an advance payment of no more than 40% of the total construction cost with the balance spread over 36 monthly bills. *Re New England Telephone and Telegraph Co.,* —— P.U.R. 4th ——, —— (Me.Pub.Util.Comm.1977) [hereinafter cited as *Decree*].

New England contends that the order invades an area of management discretion without any finding that its present practice is unreasonable and without any evidence to support such a finding.

The line extension charge is one of the items included in New England's proposed rate design which was modified by the Commission's decree. We have already decided that it is unnecessary for us to consider rate design issues at this time because a new rate design will be determined upon remand. Similarly, we find it unnecessary to consider the issue of line extension charges at this time.

### c. Publication of Charges in Directories

In order to increase the customer's awareness of telephone rates, the Commission ordered the publication in telephone directories issued after September 1, 1977, of

the basic residential and business local exchange rates and the toll schedule for Maine intrastate message toll service. *Decree* at ——.

New England agrees that its customers should be informed of its charges, but contends that the publication requirement is not supported by any finding or evidence that it is a reasonable method of accomplishing this purpose, when compared to alternative methods.

■■■ The Legislature has authorized the Commission to control certain business practices of a public utility in order to promote reasonable service.

If upon such public hearing it shall be found that any regulation, measurement, practice, act or service complained of is unjust, unreasonable, insufficient or unjustly discriminatory or otherwise in violation of any of the provisions of chapters

1 to 17 . . ., the commission shall have power to establish and substitute therefor such other regulations, measurements, practice, service or acts, and to make such order respecting and such changes in such regulations, measurements, practice, service and acts as shall be just and reasonable. 35 M.R.S.A. § 294.

We find that the Commission's order for the publication of certain rates in this case is a proper and reasonable exercise of the power granted it by the Legislature.

### d. Information Provided New Customers

The Commission ordered:

That at the time of the application, New England Telephone shall inform customers who are applying for new service or modifying existing service of the three element and/or service connection charges. In cases of new telephone service, customers should be told of the basic monthly rates for four-party and two-party service as well as for single-party service. This information should be conveyed in language as comprehensible as possible to the layman. *Decree* at ——.

New England contends that the order invades management discretion and is unnecessary because it already provides such information to all customers who inquire.

■■■ The Commission claims that New England's provision of this information to those customers "who inquire" is insufficient to ensure that all customers make an informed decision. We hold that this order is a proper exercise of the Commission's discretion in this area. 35 M.R.S.A. § 294.

### e. Information Concerning Party Line Problems

The Commission ordered:

That New England Telephone shall advise the Commission by no later than July 15, 1977 of the problems, if any, inherent in offering one-party, two-party and four-party residential service in all its local exchanges throughout the State. *Decree* at ——.

New England contends that this requirement is unfounded and unnecessary.

██ We find that the Commission's request for the information properly lies within its information gathering powers. *See* (a), *supra*, Records of I.R.S. Contacts.

f. Directory Assistance Calls Information

The Commission ordered:

That New England Telephone shall cause to be shown on a separate line in each monthly billing statement issued after September 1, 1977 the number of directory assistance calls made by each subscriber during the month as well as the total charges for directory assistance that result from such calls in excess of the directory assistance allowance of 10 calls per month. *Decree* at ——.

New England contends that this requirement is overbroad and burdensome and was imposed without any finding of the usefulness of such information.

██ We find this requirement that New England provide its customers with certain basic information to be reasonable and within the power and discretion granted the Commission by the Legislature. 35 M.R.S.A. § 294.

g. Free Telephone Directories

The Commission ordered:

That directories of all exchanges with exchange centers within . . . 30 airline miles of the subscriber's local exchange center shall be furnished without additional charge, and there shall be a maximum charge of $1.00 per directory within the State for customers who would not otherwise be eligible for a directory without charge. *Decree* at ——.

New England contends that this order invades management discretion without any finding that the present practice is unreasonable and without any finding or supporting evidence that the Commission's scheme is reasonable.

██ We find the Commission's order to be reasonable and within the power and discretion granted by the Legislature. 35 M.R.S.A. § 294.

h. WATS Usage Information

The Commission ordered:

That New England Telephone shall cause to be shown on a separate line in each monthly billing statement issued to each WATS subscriber on or after September 1, 1977 the number of hours of usage of this service, whether the service taken is Measured WATS or Full Time WATS. *Decree* at ——.

New England contends that this order invades the area of managerial discretion by ordering a change in its billing practice without supporting evidence in the record.

██ As with other orders of the Commission requiring the furnishing of certain helpful information to New England's customers, we find no abuse of the power and discretion vested in the Commission by the Legislature. 35 M.R.S.A. § 294.

i. Toll Settlements

Toll settlements constitute payments by New England to independent intrastate telephone companies (independents) to reimburse them for toll charges collected by New England from the independents' subscribers. When a subscriber of an independent telephone company makes a toll call to an exchange outside the independent's area (joint toll call), the independent actually collects the toll charge from its subscriber and pays New England the entire amount. In turn, New England reimburses the independent according to a formula provided by contract. New England contends that the Commission's refusal to adjust its toll settlements in this case is arbitrary, capricious, and unlawful.

We find it unnecessary to reach this issue at this time. Adjustments in toll settlements are not treated as a part of New England's overall revenue requirement. Rather, they are considered as factors in determining whether a proposed rate schedule or rate design in fact generates the desired revenue level. Because we do not reach the rate design issues in this case (*See*

(b), *supra*, Revised Line Extension Tariff), we will not now consider New England's objections to the Commission's actions in this respect.

## XI.

### ISSUES NOT DECIDED

A few other issues were raised by the briefs, but no longer require consideration by this Court.

#### a. Other Tax Deferral Issues

New England initially challenged the Commission's refusal to normalize tax deferrals resulting from (1) accelerated depreciation for state income tax purposes, (2) cost of removal and related salvage of plant taken out of service, and (3) vacation accruals. However, its reply brief concedes that these issues were decided in the Commission's favor by our recent decision in *Central Maine Power Co. v. Public Utilities Commission*, Me., 382 A.2d 302 (1978).

#### b. Gross Receipts Tax

The parties briefed the issue whether the Commission properly disallowed New England's proposed gross receipts tax adjustment. Since that time the parties have agreed that the attrition allowance takes into account this proposed adjustment, and so informed this Court on February 10, 1978, that the adjustment was not an issue.

#### c. Rate Design

As we have already explained, we find it unnecessary to consider the rate design issues in this case because the filing of new rate schedules will be necessary after remand to the Commission.

The entry must be:

Section 303 appeal sustained in part and denied in part.

Section 305 complaint granted in part and denied in part.

Judgment for plaintiff in Section 305 complaint.

Remanded to the Public Utilities Commission for further proceedings consistent with this opinion.

WERNICK, ARCHIBALD, GODFREY and NICHOLS, JJ., and DUFRESNE, A. R. J., concurring.

McKUSICK, C. J., did not sit.

DELAHANTY, J., did not sit.

DUFRESNE, A. R. J., sat by assignment.